UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIGHTHOUSE FINANCIAL GROUP, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>THE ROYAL BANK OF SCOTLAND GROUP, PLC, et al.,<br><br>     Defendants. | Civil Action No. 1:11-cv-00398-GBD<br><br><u>CLASS ACTION</u> |
| ETHAN GOLD, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>THE ROYAL BANK OF SCOTLAND GROUP, PLC, et al.,<br><br>     Defendants. | Civil Action No. 1:11-cv-01162-NRB<br><br><u>CLASS ACTION</u> |

LEAD PLAINTIFFS' OBJECTION TO DEFENDANTS' NOTICE OF
SUPPLEMENTAL AUTHORITY

762595_1

**I.     INTRODUCTION**

In their latest notice of supplemental authority ("Second Notice"),[1] defendants refer to *In re Royal Bank of Scotland Grp. PLC Sec. Litig.*, No 09-cv-300 (DAB) (S.D.N.Y. Sept. 4, 2012) (the "*Freeman*" case), as "parallel" to this case. It is. Defendants, however, misunderstand what that means. The two cases both arose from the same general set of facts, but, as is true for all things parallel, these cases will always be separated by their disparate ***non-overlapping*** claims and allegations. Put simply, although the facts overlap, *Freeman* raised claims and allegations not raised here, and this case raises claims and allegations not raised in *Freeman*. The majority of the allegations here pertain to Lead Plaintiffs' 1934 Securities Exchange Act claims ("'34 Act claims"), whereas the iteration of *Freeman* that Judge Batts dismissed involved only claims under the 1933 Securities Act ("'33 Act claims").[2] What this means is that Judge Batts did not consider, let alone reject, the 243 paragraphs of allegations, spanning 127 pages of the Consolidated Amended Complaint (the "CAC"), that comprise the '34 Act claims here. In fact, the American Depository

---

[1]     Defendants' September 11, 2012 filing (Dkt. No. 151) marks the second time in less than a month that they have used a recently issued District Court order as a pretext for supplemental briefing on their motions to dismiss (*see also* Dkt. No. 148). The last round of defendants' supplemental briefing even included a reply brief (*see* Dkt. No. 150) – for a notice of supplemental authority. This Court is perfectly capable of reading another Judge's order and determining what, if any, impact it should have on this case, so there is no need for defendants' "notices" to consist of anything more than a citation to a recent order as one the Court may find relevant to its analysis. If the Court wants additional briefing, it always has the discretion to order it. Instead, in an implicit acknowledgment that the actual briefing on their motions to dismiss does not favor them, defendants have been lobbing into the record one argumentative brief after another. Worse, because defendants' briefs do not present fair comparisons between other cases and this one, Lead Plaintiffs are forced to respond. If defendants again insist on setting their own rules by filing another "reply" brief, Lead Plaintiffs will request a hearing and/or leave to file sur-reply.

[2]     Unless noted otherwise, all of the references to *Freeman* in this brief refer to this pared-down version of that case and complaint, as that is the only version that Judge Batts considered in her order dismissing the *Freeman* complaint (the "*Freeman* Order").

Shares ("ADSs") that are the subject of the '34 Act claims here did not even *start* trading until October 2007 – **well after the last of the five offerings at issue in *Freeman***.

Because these cases allege different statements made during different time periods, the *Freeman* Order is entirely inapplicable to the '34 Act claims alleged here. For instance, plaintiffs' '34 Act claims here are based on affirmatively false statements, whereas the '33 Act claims in *Freeman* were limited to omissions from offering documents that pre-dated nearly all of these false statements. The affirmatively false statements alleged here, including false statements regarding specific amounts of the Royal Bank of Scotland Group, PLC's ("RBS") credit market exposures made in numerous conference calls and post-offering Securities and Exchange Commission ("SEC") filings (CAC, ¶¶167-168, 175-177, 191, 233), were not even *eligible* for inclusion in the final iteration of *Freeman,* which, again, was limited to omissions. *See, e.g.*, *Freeman* Dkt. No. 182, ¶¶96, 99, 101 (repeatedly alleging failures to disclose). Judge Batts, therefore, could not consider post-offering SEC filings in which defendants made affirmatively false statements about credit market exposures. *See, e.g.*, CAC, ¶233 ("RBS then falsely represented in its 2007 Annual Report that its purported exposure to subprime-backed CDOs, RMBS, monoline insurers and illiquid CLOs and illiquid leveraged loans was approximately $33 billion (including leveraged financing exposures) as of December 31, 2007 when, in fact, as shown, RBS's actual exposure was at least $88 billion."). These numerous statements are summarized in a detailed chart (CAC, ¶15), not alleged in *Freeman*. Nor could Judge Batts consider the false statements defendants made during conference calls with analysts in June and August 2007. *See, e.g.*, CAC, ¶177 (in response to analyst question about credit market exposure, defendant Cameron falsely responded, "We've cut back a lot since the year end of '06 in our exposure to these sorts of markets and I told you then that they were very modest. We've taken no credit losses anywhere in the portfolio.").

In total, the 41 paragraphs spanning pages 65-101 of the CAC all **post**-date the last of the offerings at issue in *Freeman*, and therefore were not considered, let alone, rejected by Judge Batts. Therefore, at bottom, defendants ask this Court to rely on the *Freeman* Order to reject '34 Act allegations not even made in *Freeman*.

## II. JUDGE BATTS ALREADY RECOGNIZED THE "SIGNIFICANT DIFFERENCES" BETWEEN THESE CASES

Before explaining why the *Freeman* Order does not apply here, a brief history of the cases is in order. The *Freeman* case began with a complaint filed on January 12, 2009, which raised only '33 Act claims. *See Freeman* Dkt. No. 1. Other complaints followed and culminated with the filing of a consolidated complaint on July 15, 2009, which raised both '33 Act claims and '34 Act claims. *See Freeman* Dkt. No. 75. On January 11, 2011, approximately six months after the Supreme Court's decision in *Morrison*, Judge Batts dismissed seven of the 10 counts of the consolidated complaint, including all of the '34 Act claims, on standing grounds – none of the lead plaintiffs had actually purchased any RBS ADSs on the New York Stock Exchange. *See Freeman* Dkt. No. 158 at 23.

On January 19, 2011, the initial complaint was filed in this case, which raised only '33 Act claims. *See* Dkt. No. 1. On January 28, 2011, an amended complaint was filed, which raised only '34 Act claims. *See* Dkt. No. 4. On March 7, 2011, a motion was filed to consolidate this case with the *Freeman* case. *See* Dkt. No. 16. On March 18, 2011, **after** that motion to consolidate was filed, an amended complaint was filed in *Freeman*, which raised only '33 Act claims. *See Freeman* Dkt. No. 182. So, to be clear, from July 15, 2009 through January 11, 2011, the *Freeman* case included '34 Act claims. As of January 28, 2011, however, the case before **this** Court was the **only** case that included '34 Act claims. Therefore, **after** the '34 Act claims were dropped in *Freeman* and added here, the disparities between the two cases increased significantly. Accordingly, on May 18, 2011,

- 3 -

762595_1

Judge Batts denied the motion to consolidate because of the "significant differences" between the cases, including specifically,

> different claims, different class periods, and []different classes . . . . Furthermore, The Freeman Group brings legal claims under the Securities Act of 1933 on behalf of purchasers of RBS preferred shares, while [this case] brings claims under the Securities Exchange Act of 1934 on behalf of U.S. purchasers of RBS ADRs.

*See Freeman* Dkt. No. 192.

The foregoing chronology demonstrates why *Freeman* tolled the statute of limitations for the '34 Act claims from July 15, 2009 through January 11, 2011, yet by May 18, 2011 and continuing through today, there were, and are, "significant differences" between the cases.

## III. EACH PORTION OF THE *FREEMAN* ORDER DEFENDANTS ASK THIS COURT TO FOLLOW IS INAPPLICABLE HERE

### A. Defendants' False and Misleading Statements Regarding Credit-Market Exposures Were Never Alleged in *Freeman*

It is one thing to allege that defendants failed to disclose credit market risks (at a time of marginal market concern), as in *Freeman*, but it is quite another thing to allege that defendants affirmatively misrepresented specific amounts of credit market exposures (during a time of peak market concern), as is the case here. *See, e.g.*, CAC, ¶233 ("RBS then falsely represented in its 2007 Annual Report that its purported exposure to subprime-backed CDOs, RMBS, monoline insurers and illiquid CLOs and illiquid leveraged loans was approximately $33 billion (including leveraged financing exposures) as of December 31, 2007 when, in fact, as shown, RBS's actual exposure was at least $88 billion."). Unlike the omissions in the earlier offerings in *Freeman*, defendants made the false and misleading statements alleged here directly in response to growing market concern and panic over credit-market exposures. *See, e.g.*, CAC, ¶177 (in response to an analyst question about credit market exposure, defendant Cameron falsely responded, "We've cut back a lot since the year

end of '06 in our exposure to these sorts of markets and I told you then that they were very modest. We've taken no credit losses anywhere in the portfolio.").

Moreover, the disparity between the relevant time periods here compared with the last iteration of *Freeman* is critical to understanding the *Freeman* Order's inapplicability to the '34 Act claims. Defendants point out that "Judge Batts held that RBS had disclosed its securitization ***activities*** as early as its 2005 Annual Report, and the preferred shareholders had 'allege[d] no contemporaneous facts to support the allegation that at the time of the relevant Offering Documents the AAA-rated CDOs presented credit risks [that] would have been deemed material information by investors.'" *See* Second Notice at 2 (quoting *Freeman* Order at 18) (emphasis added). The "time of the relevant Offering Documents" in *Freeman* began on May 22, 2006 (*see Freeman* Dkt. No. 182 at i, ii), when the market was not concerned about credit market risks. The primary false statements alleged in the '34 Act claims here, however, did not ***begin*** until summer 2007, and the ADRs at issue here did not ***start*** trading until after October 17, 2007, when the financial markets were deeply concerned about credit market exposures, as demonstrated by repeated analyst questions and a growing number of downgrades and bank failures. The CAC alleges facts clearly demonstrating that throughout the period relevant to the '34 Act claims, credit market exposures were of critical importance to the market. Consider the following ***examples***:

> RBS senior executives, including the Individual Defendants, were regularly questioned by market analysts about RBS's subprime and other credit market exposures. By 2007, this was their primary focus with respect to banks due to the ongoing credit crisis.

CAC, ¶138.

> Notably, on July 10 and 12, 2007, Moody's and Standard & Poor's, respectively, instituted mass downgrades on thousands of mortgage-backed securities, sending shockwaves throughout the economy.

CAC, ¶143 n.4.

- 5 -

> A member of the U.K. Treasury Panel has described the failure of Northern Rock Bank, in mid-September 2007, as an "earthquake . . . [hit]ting the financial services industry."

CAC, ¶254. *See also id.*, ¶¶137, 149, 181, 188-189, 280; SECDIG 2010-141-6, 2010 WL 2975754 (S.E.C. July 29, 2010) (summer and fall of 2007 was "a time of heightened investor and analyst interest in public company exposure to sub-prime mortgages"). Accordingly, here, Lead Plaintiffs have "allege[d] no contemporaneous facts to support the allegation that at the time of the relevant [trading period] the AAA-rated CDOs presented credit risks [that] would have been deemed material information by investors." *See Freeman* Order at 18.

### B. The Accounting Violations Alleged Here Are Worlds (and Years) Apart from *Freeman*

Defendants next turn to Judge Batts's findings regarding the alleged accounting violations in *Freeman*. *See* Second Notice at 2-3. Here again, the differences between the two cases render *Freeman* inapplicable. For example, the accounting violations alleged in the CAC relate primarily to International Financial Reporting Standard 7 (CAC, ¶¶231-234) and International Accounting Standard 36 (CAC, ¶¶249, 252, 254-255). Neither of these standards was at issue in *Freeman*. Also, the accounting violations in *Freeman* were based on alleged failures to disclose in financial statements that were "largely made in later 2005 and early 2006, before the subprime crisis began to seriously affect CDO holders." *See Freeman* Order at 22. In contrast, here, plaintiffs allege affirmatively false financial statements made from mid-2007 through 2008 (CAC, ¶¶167-220) when the subprime crisis was in full swing. As demonstrated above, there is no question that risks posed by credit-market assets such as CDOs were critically important to investors during this period.

In addition to post-dating all of the omissions and offerings in *Freeman*, the accounting violations alleged here are based on affirmatively false statements, not mere omissions. *See, e.g.*, CAC, ¶201(l) (defendants' 2007 Annual Report "represented that the Company held only

- 6 -

£5.1 billion ($10.2 billion) of CDOs, £1.5 billion ($2.6 billion) of subprime RMBS, and £10.1 billion ($20.2 billion) of CLOs and leveraged loans.  In fact, at this time RBS held approximately £11.3 billion ($22.6 billion) of CDOs, £4.3 billion ($8.6 billion) of subprime RMBS, and £28.55 billion ($57.1 billion) of CLOs and leveraged loans"). These $55 billion of understatements amount to over 150% of the size of RBS's October 13, 2008 offering, which the U.K. government underwrote just to keep RBS afloat. CAC, ¶348.  So, here we have different accounting violations, during a different time period, based on affirmatively false statements, as opposed to omissions, concerning undeniably material amounts.  Accordingly, the *Freeman* Order in no way supports dismissal of the accounting violations alleged here.

    **C.**    **The ABN AMRO Allegations in *Freeman* Are Markedly Different than Those Raised in This Case**

With respect to "misstatements and omissions concerning the ABN transaction" (*see* Second Notice at 3), disparities in the timing and substance of allegations once again render the *Freeman* Order inapplicable.  All of the offerings at issue in *Freeman* occurred ***before*** RBS's acquisition of ABN, and the *Freeman* complaint did "not identify any basis for alleging that RBS knew of ABN's subprime exposure prior to the completion of the acquisition." *See Freeman* Order at 25.  As a result, Judge Batts found that there was no duty to report such unknown information and that positive statements made prior to the purchase amounted to "nothing more than corporate optimism" about a potential acquisition. *See id.* at 26 (cited in Second Notice at 3-4). Here, because the ADSs did not start trading until ***after*** the ABN acquisition, the CAC includes statements that were knowingly false because they were made ***after*** RBS had acquired ABN and therefore knew that the acquisition was a disaster:

> ***After the acquisition closed and RBS had unfettered access to ABN AMRO's financials, as billions of dollars of credit losses mounted, RBS continued to assure investors unequivocally that the deal was a success, even going so far as***

> ***to say on December 6, 2007 that the deal was more successful than originally anticipated***. RBS stated that "[t]ransaction benefits, return on investment and earnings accretion [are] slightly higher than forecast." On a conference call that same day, defendant Goodwin represented that "[t]he acquisition of ABN AMRO has rarely seemed more attractive and relevant than it does at this point . . . ." In sum, RBS stated "ABN AMRO'S funding and liquidity position remains strong."

CAC, ¶147.

> Also on February 28, 2008, defendants continued to represent that the acquisition was an unmitigated success. For example, defendant Goodwin falsely stated that the integration of ABN AMRO was going better than anticipated and that the acquisition was nothing but accretive to the Company: "***There are a lot of areas where it just goes ching, ching, ching, ching, ching . . . . We are happy we bought what we thought we bought***." Defendant Goodwin, furthermore, stated: ". . . ***I think the main news is that with a view of all of the businesses, a positive view we had of the ABN businesses has been confirmed***."

CAC, ¶150.

The above statements are ***not*** forward-looking expressions of corporate optimism as was the case in *Freeman*. They are blatantly false statements of what had already occurred. Defendants have admitted as much:

> Defendant McKillop has admitted, during testimony in front of the U.K. House of Commons Treasury Committee charged with investigating the financial crisis, that the problems stemming from ABN AMRO's massive credit market exposures were apparent from the start, stating that "***no sooner had we acquired ABN Amro then the world changed dramatically and we were unable to implement that plan***." McKillop's statements are supported by ABN AMRO's fourth quarter 2007 financial results, which revealed that credit losses had already begun by the time the deal closed.

CAC, ¶193(b). *See also id.*, ¶¶141, 251, 256. As none of foregoing allegations were raised in *Freeman*, Judge Batts's conclusions regarding the allegations concerning ABN AMRO are inapplicable here.

        **D.**    **This Case Raises No Claims About a Supposed Capital Base Policy**

The final aspect of the *Freeman* Order defendants address in their Second Notice is one that exists only in their notice. Defendants represent that "Judge Batts rejected the preferred

- 8 -

shareholders' claims challenging statements by RBS in 2006 and 2007 that it maintained a 'strong capital base.'" See Second Notice at 4.  As the *Freeman* Order itself proves, however, what Judge Batts actually rejected were "[p]laintiffs' allegations regarding RBS's capital base ***policy***."  See *Freeman* Order at 16 (emphasis added).  The CAC does not even include the phrase "capital base policy," let alone raise any allegations concerning such a policy.  As such, this argument highlights yet another critical reason why the *Freeman* Order is inapplicable to this case:  *Freeman* relied on a number of allegations concerning subjective statements, such as "business philosophy," "concentration of risks," and "internal controls." See *Freeman* Order at 8, 15, 17, 19.  In contrast, the allegations here concern objectively false statements, such as "RBS then falsely represented in its 2007 Annual Report that its purported exposure to subprime-backed CDOs, RMBS, monoline insurers and illiquid CLOs and illiquid leveraged loans was approximately $33 billion (including leveraged financing exposures) as of December 31, 2007 when, in fact, as shown, RBS's actual exposure was at least $88 billion."  CAC, ¶233.

## IV.  CONCLUSION

Based on the foregoing, Lead Plaintiffs respectfully submit that the significant differences between this case and the *Freeman* case render the *Freeman* Order inapplicable here.  This conclusion is crystal clear regarding the '34 Act claims, which are unique to this case.

DATED:  September 18, 2012          Respectfully submitted,

                                                ROBBINS GELLER RUDMAN
                                                  &DOWD LLP
                                              THEODORE J. PINTAR
                                              JASON A. FORGE
                                              DARRYL J. ALVARADO

                                                              s/ Jason A. Forge
                                                               JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 18, 2012.

s/ Jason A. Forge
JASON A. FORGE

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:   jforge@rgrdlaw.com

762595_1

# Mailing Information for a Case 1:11-cv-00398-GBD

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com
- **Charles H. Dufresne , Jr**
  cdufresne@sglawyers.com
- **Paul Adam Engelmayer**
  paul.engelmayer@wilmerhale.com
- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com
- **Shauna Kathleen Friedman**
  shauna.friedman@wilmerhale.com
- **D. Seamus Kaskela**
  skaskela@ktmc.com
- **Thomas Livezey Laughlin , IV**
  tlaughlin@scott-scott.com,efile@scott-scott.com
- **David Sapir Lesser**
  david.lesser@wilmer.com,lesserda@yahoo.com
- **James Stuart Notis**
  jnotis@gardylaw.com
- **Theodore J. Pintar**
  tedp@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Andrea J. Robinson**
  andrea.robinson@wilmerhale.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **David R. Scott**
  drscott@scott-scott.com,efile@scott-scott.com
- **Robert Walter Trenchard**
  robert.trenchard@wilmer.com
- **Curtis Victor Trinko**
  ctrinko@gmail.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Ethan Gold**
,

- 2 -

**David M. Promisloff**
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087