UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LIGHTHOUSE FINANCIAL GROUP,
Individually, and on Behalf of All Others
Similarly Situated,

        Plaintiffs,

   -against-

THE ROYAL BANK OF SCOTLAND GROUP,
PLC, et al,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION AND
ORDER
11 Civ. 398 (GBD)

GEORGE B. DANIELS, United States District Judge:

 Lead Plaintiff IBEW Local Union No. 58 Pension Trust Fund and Annuity Funds and additional Plaintiffs City of Taylor General Employees Retirement System and Ute Mountain Ute Tribe bring this action on behalf of themselves and all others similarly situated against The Royal Bank of Scotland Group, PLC ("RBS") and seventeen current and former directors of RBS (the "Individual Defendants")[1] for securities law violations. Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("'33 Act") and violations of Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act of 1934 ("'34 Act"). Plaintiffs are purchasers of RBS's American Depository Receipts

---

[1] The Consolidated Amended Complaint ("CAC") subdivides the Individual Defendants into two groups: (1) the "'34 Act Defendants," namely Sir Thomas McKillop, Sir Frederick Goodwin, Guy Whittaker, John Cameron, Lawrence Fish, and (2) the additional "Exchange Offer Defendants," a group that includes the '34 Act Defendants as well as Gordon Pell, Mark Fisher, Colin Buchan, James Currie, Sir Stephen Robson, Robert Scott, Peter Sutherland, Archibald Hunter, Charles Koch, Joseph MacHale, Janis Kong, and William Friedrich. (CAC ¶¶ 50-71).

("ADRs"), and allege that these shares lost value because of the Defendants' securities violations.

The procedural history of this case begins with a similar case, Zemprelli v. The Royal Bank of Scotland Group, PLC, et al, No. 09 Civ. 300, before Judge Deborah Batts.  Plaintiffs in Zemprelli filed their initial class complaint against RBS on January 12, 2009, asserting misstatements and omissions arising out of some of the same acts as the instant complaint, on behalf of a broad set of security holders including those who held ADRs.  (No. 09 Civ. 300, Dkt No. 1).  After appointing lead plaintiffs in Zemprelli, Judge Batts dismissed the ADR claims on January 11, 2011 because no lead plaintiff had actually purchased an ADR during the class period.  (No. 09 Civ. 300, Dkt No. 158).[2]  ADR-holder Plaintiffs then brought their claims as this separate action, filing their first complaint on January 19, 2011 (Dkt. No. 1) and the operative CAC on November 1, 2011 (Dkt. No. 71).

On January 13, 2012, RBS and the Individual Defendants moved to dismiss the CAC for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (Dkt Nos. 83, 85), and under the forum non conveniens doctrine. (Dkt. No. 74).  On March 13, 2012, Plaintiffs filed a motion to strike certain materials from the Defendants' motion to dismiss. (Dkt. No. 102).  RBS's motion to dismiss for failure to state a claim is GRANTED.  The Individual Defendants' motion to dismiss for failure to state a claim is GRANTED. Plaintiffs' motion to strike is DENIED.  Dismissal of the CAC for failure to state a claim renders RBS's motion to dismiss under the forum non conveniens doctrine moot.

---

[2] Judge Batts dismissed Plaintiffs' remaining claims in Zemprelli for failure to state a claim under Fed. R. Civ. P. 12(b)(6) on September 4, 2012.  (See No. 09 Civ. 300, Dkt. No. 230).

## Background[3]

This is a class action on behalf of investors who acquired RBS ADRs in RBS's October 2007 Exchange Offer or subsequently purchased them on the open market. (CAC ¶ 2). Although Plaintiffs allege that the class period began to run on March 1, 2007, RBS did not list any ADRs until it closed its acquisition of ABN AMRO on October 17, 2007. (Id. ¶¶ 2, 11). Plaintiffs assert that they have suffered "devastating losses" as a result of Defendants' false and misleading statements. (Id. ¶ 30). Plaintiffs claims fall into three general areas: (1) false statements and omissions in connection with RBS's acquisition of Dutch bank ABN AMRO (Id. ¶ 6); (2) false statements and omissions concerning the nature of RBS's exposure to the U.S. subprime mortgage market and other credit market assets (Id. ¶ 5); and (3) false statements and omissions involving RBS's April 2008 rights issue (Id. ¶ 7).

### 1. The ABN AMRO Acquisition

In May 2007, RBS announced that it would be submitting a bid to purchase the Dutch bank ABN AMRO in partnership with Belgian bank Fortis and Spanish bank Banco Santander. (Id. ¶¶ 11, 141). RBS was to acquire 38% of ABN AMRO, including its wholesale, global markets, and investment banking units for $38 billion[4] in cash and securities. (Id. ¶¶ 13, 141). The transaction required RBS to exchange ABN AMRO ADRs for newly issued RBS ADRs. (Id. ¶ 32).

---

[3] The facts in this section are drawn from the CAC. They are assumed to be true for purposes of a motion to dismiss.

[4] For ease of comparison, all figures have been converted to U.S. Dollars where the complaint has made the conversion available.

Plaintiffs claim that RBS mislead investors about the nature of the due diligence RBS completed prior to the transaction's close and about the benefits of the transaction to RBS. Although RBS filed several documents in connection with the Exchange Offer that alluded to, but never stated that it was actually conducting ongoing due diligence, then-RBS CEO Sir Thomas McKillop later confirmed that the due diligence was done in May 2007. (Id. ¶ 76). After the transaction closed, Defendants continued to maintain that the acquisition was proceeding ahead of schedule and that "synergies" from the combination were "on track," (See, e.g., Id. ¶¶ 6, 155, 190, 217, 333), even though RBS would go on to take losses as a result of the merger. (Id. ¶¶ 8, 19, 156).

The losses stemmed principally from writing down ABN AMRO's securitized portfolio and acquired goodwill. (Id. ¶ 222). RBS acquired $14 billion of goodwill in the purchase. (Id. ¶ 249). RBS's filings disclosed that it considered whether to write down this amount in February, April, May, and August 2008, but each time apparently decided against impairing it. (Id.). It was only sometime between August 2008 and December 2008 that RBS then decided to take a $12.55 billion impairment of the acquired goodwill, a figure reflected in its 2008 year-end financial filings announced on January 19, 2009. (Id. ¶¶ 222, 249). Plaintiffs allege that RBS should have taken this impairment charge sooner because the ABN AMRO businesses it acquired were "not as sought after" and because it should have been immediately apparent to RBS that it had overpaid for the Dutch bank. (Id. ¶¶ 251, 255).

## 2. RBS's Subprime Exposure

Plaintiffs also allege that RBS failed to disclose its exposure to subprime and other credit market assets in the Exchange Offer Documents, and consistently made false and misleading

4

statements regarding its actual exposure to such assets until its massive write down on January 19, 2009. (Id. ¶¶ 83, 222). Plaintiffs allege that while losses mounted, RBS falsely represented its actual exposure and made reassuring statements to investors. (Id. ¶ 244). For example, in early 2007, RBS stated that its "[o]verall credit metrics remain strong" and that the amount of subprime exposure it had was small, even though the amounts it had were allegedly in the billions. (Id. ¶¶ 87, 90, 93). Plaintiffs do not allege any facts that indicate how they calculated RBS's exposure to subprime at the time, or that any Defendant disbelieved these statements when made.

Plaintiffs contend that RBS continued to make these sorts of false reassuring statements throughout 2007 and 2008. RBS's 2007 annual report, issued on February 28, 2008, claimed that the company had taken "active steps to manage" its risk profile and reassured investors that its credit metrics continued to be strong. (Id. ¶ 194). Despite mounting losses, RBS officers reassured investors that they remained comfortable with the valuations and write-downs they had made. (Id. ¶ 197). In response to a question about whether it originated subprime loans, Sir Frederick Goodwin stated "We don't do subprime so we have not perhaps been exposed to some of the more boisterous elements of the market that others have." (Id. ¶ 9).

Not only did RBS continue to make reassuring statements about its approach to subprime, but Plaintiffs allege that it also misled investors about its actual exposures. For example, Plaintiffs allege that RBS's statement that ABN AMRO had a "very limited exposure to the subprime segment" was false because it in fact had exposures to CDOs exceeding $3.2 billion. (Id. ¶ 93). Plaintiffs allege that RBS's statement that it did not "do subprime" was itself false because RBS held retained interests from its securitizations of over $26 billion. (Id. ¶ 18). In making this allegation, Plaintiffs omit that when RBS said that it did not "do subprime," it was

5

talking about direct origination of subprime loans by its Citizens Bank division. It was not discussing its credit portfolio on a balance sheet of over a trillion dollars.[5]

Ultimately, RBS posted a loss of $41.3 billion for the year ending December 31, 2008 on January 19, 2009, which included $11.3 billion in write downs of credit market assets. (Id. ¶ 222). Plaintiffs concede that a good portion of these losses were caused by a deterioration in financial market conditions that caused credit markets to become illiquid. (Id. ¶¶ 32, 223). But Plaintiffs allege that a large part of RBS's losses were due to what new RBS CEO Stephen Hester termed "inappropriate risk concentrations," and that Defendants' false statements and omissions illicitly shielded these problems with RBS's balance sheet from public view. (Id. ¶ 224).

### 3. The April 2008 Rights Offer

The third area of alleged false statements and omissions concerns RBS's $24 billion rights issue in April 2008. Plaintiffs allege that in order to complete the rights issue, RBS concealed its rising losses in the structured credit markets and overstated the benefits of the ABN AMBRO transaction. (Id. ¶ 7). Plaintiffs claim that RBS misrepresented the very nature of the rights issue: initially, RBS stated that it needed the capital to improve its core tier 1 capital ratios, but by the time it had completed the offering, it needed the money just to maintain them after inter-bank lending began to freeze up along with the credit markets. (Id. ¶¶ 7, 154). Despite thinking that they would not need any additional capital after the April rights issue, RBS was ultimately forced to take a capital injection of $34.6 billion from the British Government on

---

[5] Plaintiffs never offer any facts that would allow the Court to infer how Plaintiff calculated many of RBS's supposed actual exposures.

October 13, 2008. (Id. ¶¶ 155, 218). A few short weeks thereafter, Lehman Brothers failed,

Fannie Mae and Freddie Mac were taken into conservatorship by the Federal Government, and

the credit markets became their most illiquid.

## Legal Standard

A complaint must have "enough facts to state a claim to relief that is plausible on its

face" to survive a motion to dismiss for failure to state a claim. Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007). "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement

to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

Plausibility requires "more than labels and conclusions." Id., at 555. Legal conclusions must be

supported by well-pleaded factual allegations. Iqbal, 556 U.S. at 679. "When there are well-

pleaded factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief." Id.

Claims that sound in fraud must meet the heightened pleading standards of Fed. R. Civ.

P. 9(b). To satisfy Rule 9(b), the plaintiff must "(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent." In re Wachovia Equity Securities

Litigation, 753 F. Supp. 2d 326, 347 (S.D.N.Y. 2011) (quoting Rombach v. Chang, 355 F.3d

164, 170 (2d Cir. 2004)). While "fraud is not an element or a requisite" to a claim under §§ 11

or 12(a)(2) of the '33 Act, a '33 Act claim that is predicated on fraud is subject to the

particularity requirement of Rule 9(b), despite any disclaimer a plaintiff makes to the contrary.

Rombach, 355 F.3d at 171.

7

Although Plaintiffs disclaim any reliance on fraud for their '33 Act claims (See CAC ¶¶ 72, 98, 110, 123), these claims, by their plain terms, sound in fraud.  Plaintiffs premise each of their three '33 Act claims on the "false and misleading" statements, "untrue statements of material fact" and "untrue statements and material omissions" in the Exchange Offer Documents. (See Id. ¶¶ 75, 77, 87, 90, 91, 93, 95).  In Rombach, the Second Circuit found that allegations that a registration statement was "'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that [it contained] 'materially false and misleading written statements'" are phrases "classically associated with fraud."  Rombach, 355 F.3d at 171.

Plaintiffs also use many of the same factual allegations to make out their '33 Act claims as they do their '34 Act claims, which necessarily must allege fraud.  For example, Plaintiffs allege that RBS's statement that "we have retained our inherently cautious stance towards higher risk activities such as unsecured consumer lending and sub-prime credit markets more generally" was a false and misleading statement that demonstrates violation of both the '33 Act (See CAC ¶ 85) and the '34 Act (See Id. ¶ 158).  Several other instances of misstatements or omissions that Plaintiffs employ in alleging their '33 Act claims are the same as those they use to allege their '34 Act claims, verbatim.  (See, e.g., Id. ¶¶ 88 and 174, 178; ¶¶ 91 and 177).  Although Plaintiffs claim that they should not be held to the higher standard for their '33 Act claims because they took the trouble to separate their claims into separate sections, the false and misleading statements and omissions alleged for both sets of claims pertain to the exact same underlying events.

In addition to meeting the heightened pleading standard of Rule 9(b), Plaintiffs' '34 Act claims must meet the standards of the Private Securities Litigation Reform Act ("PSLRA").  15 U.S.C. § 78u-4(b)(1).  The PSLRA requires "particular allegations giving rise to a strong

inference of scienter." ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (quotation marks omitted). To qualify as a strong inference of scienter, it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). The facts Plaintiffs allege must support an inference of intent to defraud the Plaintiffs rather than some other group. Kalnit v. Eichler, 264 F.3d 131, 140–41 (2d Cir. 2001).

### The '34 Act Claims

Plaintiffs allege violations of § 10(b) and Rule 10b-5 of the '34 Act and control person liability under § 20(a) against the '34 Act Defendants. They allege that these Defendants issued a series of false and misleading statements and omissions between March 2007 and November 2008, and that they also caused RBS to issue false financial statements. (See CAC, ¶¶ 133-255) Defendants argue that these alleged misstatements are not actionable and that Plaintiffs do not plead loss causation or a strong inference of scienter. (RBS Br. at 52-53).

To state a claim under Section 10(b) of the '34 Act and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003). Section 20(a) imposes liability on control persons for underlying Exchange Act violations. See 15 U.S.C. § 78t. The Plaintiffs' '34 Act claims must also satisfy the pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA.

9

Plaintiffs' CAC is deficient and must be dismissed because it fails to adequately allege the strong inference of scienter the PSLRA requires. To qualify as a strong inference of scienter, it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). This Court must "consider the complaint in its entirety," inquiring "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323. This may be satisfied by showing either (1) both a motive and opportunity to commit fraud, or (2) by strong circumstantial evidence of conscious misbehavior or recklessness. ATSI Comms. Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs' CAC fails on both fronts.

To allege motive and opportunity, Plaintiffs point to the timing of the write-down and the "powerful financial motive" Defendants had to overstate the company's financial conditions. (CAC ¶¶ 307-317). Plaintiffs claim that had Defendants disclosed subprime write-offs and ABN AMRO-related write-offs separately, it would have "more negatively" impacted RBS's share price. (Id. ¶ 307). Plaintiffs allege that Defendants were motivated to take write-downs in 2008 rather than 2007 in order to inflate their 2007 bonuses. (Id. ¶¶ 308-314).

Neither allegation—analyzed separately or taken together—raises the requisite strong inference of scienter. By January 19, 2009, RBS ADRs had already lost 95% of their value. It is not plausible to claim that Defendants waited until their shares had sunk this much before announcing their large write-downs because delaying somehow helped materially inflate their share price to this point. Further, the single paragraph of the complaint that alleges this motive is devoid of facts that might demonstrate why Defendants understood that disclosing the write-

downs separately would be more harmful. Such conclusory allegations cannot sustain Plaintiffs' complaint.

The CAC's allegations that Defendants' incentive-based compensation provided financial motive to delay taking impairment charges is not pleaded with sufficient particularity and does not give rise to a strong inference of scienter. "To allege a motive sufficient to support the inference [of fraudulent intent], a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994)). Defendants maintaining the valuations that they did of subprime and ABN AMRO-related holdings at the end of 2007 is more consistent with Defendants believing that the assets were not impaired than it is with concealing true prices from auditors, shareholders, and the public in order to pocket compensation that was within the range previously disclosed to shareholders.

As to the second prong—strong circumstantial evidence of conscious misbehavior or recklessness—Plaintiffs claim that this court can glean the strong inference of scienter necessary to maintain their complaint from post-class period revelations, subsequent government investigations, and the ultimate resignation of several Defendants. To constitute strong circumstantial evidence, Defendants' conduct must have been alleged to be either deliberate illegal behavior or "highly unreasonable" and "an extreme departure from the standards of ordinary care." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). Where motive is not apparent, as here, "the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142. Neither alone nor collectively do any of these allegations lend themselves to the strong inference required.

11

The post-class period revelations fall into two broad categories: those relating to ABN AMRO, and those relating to RBS's subprime holdings. As to the ABN AMRO transaction, Plaintiffs allege that post-class period statements regarding the amount of due diligence done, the goodwill impairment, slow integration, and assets obtained all indicate that Defendants must have been aware of the truth while making their statements, but knowingly and fraudulently concealing it so as to inflate the company's share price. They do not.[6]

Plaintiffs allege that former Chairman Sir Thomas McKillop's February 2009 admission that "the due diligence was done in May" render the statements in the Exchange Offer that alluded to ongoing due diligence knowingly false. (CAC ¶ 258). The statements in the Exchange Offer however, were not false. Those statements maintain that representatives from the two banks met and discussed, among other things, "due diligence matters generally." (Id. ¶ 76). Plaintiffs do not allege that those meetings did not take place, or that the meeting participants did not discuss past due diligence matters, or other matters that might have generally related to due diligence activities. Defendants could not have had misled investors with these statements, much less with scienter, if they were not themselves false.

In addition to the timing of due diligence, Plaintiffs allege that the small amount of due diligence that Defendants later revealed was actually done raises a strong inference of scienter. (Id. ¶¶ 260-264). But Plaintiffs do not point to any statement, during the period in which RBS was supposed to be doing due diligence, in which any Defendant states that RBS had done the exhaustive due diligence that Plaintiffs, in hindsight, might have preferred. Plaintiffs only point to general statements such as that of former CEO Sir Fredrick Goodwin on May 29, 2007, who

---

[6] Judge Batts dismissed claims under the '33 Act's lower standard relating to these exact same factual circumstances. (See No. 09 Civ. 300, Dkt. No. 230 at 24-27).

said that RBS felt "better" about the company than it did a month prior (which makes sense, considering whatever due diligence RBS did was done in May). (Id. ¶ 164). Plaintiffs also point to Goodwin's statement that he was "happy" with what he saw in ABN AMRO's trading book as evidence of scienter. (Id. ¶ 181). Plaintiffs ignore that "expressions of puffery and corporate optimism do not give rise to securities violations." In re Tower Automotive Securities Litigation, 483 F.Supp.2d 327, 336 (S.D.N.Y. 2007) (quoting Rombach, 355 F.3d at 174). Goodwin stating that he was "happy" with what he had seen says nothing about what he actually saw, and is at least as consistent with him seeing a portfolio that at the time appeared to be high quality (even though later on it turned out not to be) as it is with him purposefully concealing the true nature of ABN AMRO's balance sheet. Plaintiffs also ignore that RBS disclosed that it had only done a limited amount of due diligence in the Exchange Offer Documents. (See Form F-4, filed July 20, 2007, at 46).

Plaintiffs allege that Defendants' statements about the pace of RBS's integration with ABN AMRO were materially false when made and intended to defraud investors. (CAC ¶ 264). For example, Plaintiffs point to RBS's statement on Form 6-K on December 6, 2007 that "[i]ntegration of RBS is progressing well" or that the "integration of ABN AMRO is off to a promising start" as examples of statements that were knowingly false when made and intended to deceive investors. (Id. ¶¶ 183-184). But as with Defendants' statements about the amount of due diligence done, the statements are not actionable because they are merely vague pronouncements of corporate optimism. See In re Royal Bank of Scotland Group, PLC, Secs. Litig., No. 09 Civ. 300, 2012 WL 3826261 at *10 (S.D.N.Y. Sept. 4, 2012) (citing Tower Secs. Litig., 483 F. Supp. 2d at 336). Further, Plaintiffs do not point to any evidence that any Defendant had actual knowledge that the integration was not going smoothly at the time these

13

statements were made. The CAC simply makes conclusory allegations, based largely on hindsight, that because of the write-downs RBS ultimately took related to the ABN AMRO transaction, those statements must have been knowingly false at the time.

Plaintiffs allege that Defendants made material misstatements regarding the valuation of assets obtained in the ABN AMRO transaction. (Id. ¶¶ 187-188). As evidence that these alleged misstatements were made with scienter, Plaintiffs point to fact that "immediately following the acquisition, the pieces of ABN AMRO acquired by RBS suffered severe losses," and a statement by one former RBS trader that ABN AMRO's trading books were based on "super aggressive" assumptions. (Id. ¶¶ 257, 265). These statements are insufficient to raise a strong inference of scienter. The CAC does not state when the former RBS trader made his or her statement, what period of time the statement refers to, or that any Defendant actually disbelieved RBS's valuations at the time. Rather, optimistic statements about the state of ABN AMRO's books are at least as consistent with overly optimistic valuation assumptions, which were common across financial institutions at the time, than any fraudulent scheme whereby senior RBS executives intentionally concealed low valuations.

Turning to the way RBS valued its securitized asset more broadly, Plaintiffs allege that RBS ignored contemporaneous market indicators that should have led them to write-down securitized assets sooner. (See, e.g., Id. ¶ 168). Plaintiffs claim that Defendants knowingly or recklessly ignored declines in the ABX indices in 2007 and rating agency downgrades of structured products. (See, e.g., Id. ¶ 237). They claim that had RBS incorporated these market indicators into their pricing models, they would have written down their assets much more quickly. (Id. ¶¶ 280-282).

The problem that permeates Plaintiffs' CAC with respect to its valuation claims is that Plaintiffs do not plead sufficient facts that would demonstrate that Defendants were aware that declines in these broad market indicators should have had a direct effect on the specific assets RBS owned. Rather, the CAC lumps all structured products together. This is insufficient. For example, Plaintiffs show that the ABX indices for A- and BBB-rated RMBS were declining in 2007. (Id. ¶ 283). But in the next paragraphs, instead of pleading particular facts with respect to how much of RBS's holdings were A- and BBB- rated RMBS, Plaintiffs make the blanket claim that RBS's write-down of £950 was insufficient. (Id. ¶ 285).[7] Even when Plaintiffs ostensibly break out RBS's "subprime and other credit market exposure" in charts (See Id. ¶ 15), Plaintiffs lump "Subprime US RMBS" into one category, ignoring that at the time, there may have been large valuation differences between highly and poorly rated securities.[8]

In doing so, Plaintiffs fail to meet their burden to plead particularized facts, much less ones that support a strong inference of scienter. Rather than pleading particularized facts that demonstrate that RBS knew its valuations were false and not just overly optimistic, Plaintiffs' CAC tries to obfuscate the nature of RBS's holdings, frequently lumping all "subprime and other credit market assets" into the same category (Id. ¶ 284). Plaintiffs fail to tie the specific decline

---

[7] Although Plaintiffs claim that RBS's year-end write-down of £950 was insufficient and less than that of its peers, the CAC does not state why this amount was insufficient or plead with particularity how RBS's assets measured up to those of its peers.

[8] This difference is material because of the way securities such as RMBS and CDOs were structured. Tranches of a security that are lower rated are supposed to take losses before those that are more highly rated, thereby shielding more highly rated tranches from principal impairments. For example, take an RMBS security where 30% of its tranches are rated below AAA. In the typical structure, principal losses—defaults—would have to rise to 30% before the AAA tranche took any losses. Hence, even if lower-rated securities were taking losses, it is conceivable that other more highly rated securities would not. At the end of 2007, the 90-day delinquency rate on subprime residential loans was only 4%. (See U.S. Department of Housing and Urban Development, U.S. Housing Market Conditions Historical Data, 2nd Quarter 2012, available at http://www.huduser.org/portal/periodicals/ushmc.html).

in the market indices they cite to a specific set of RBS's holdings.  Plaintiffs further fail to allege

that RBS thought that its own assets were risky, or that RBS disbelieved its valuations, but

deliberately issued statements to the contrary.  Plaintiffs simply point to post-class period

statements that indicate that RBS made large valuation mistakes.  Business judgments that, with

the benefit of hindsight, prove to be wrong do not necessarily equate to fraudulent conduct.  See

In re Citigroup Auction Rate Secs. Litig., 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2011).

Plaintiffs contend that in addition to misstating the way RBS valued its structured credit

portfolio, RBS falsely reported the company's actual holdings of such assets.  (CAC ¶¶ 15, 152,

163, 271).  For example, Plaintiffs include a chart where they supposedly detail RBS's disclosed

exposure versus RBS's actual exposure.  (Id. ¶ 15).  This claim fails to sustain Plaintiffs' CAC

because Plaintiffs plead no facts that demonstrate where they obtained their actual estimated

exposures.  To state that Defendants "falsely reported" RBS's holdings is merely to state a legal

conclusion.  Plaintiffs bear the burden of articulating facts that demonstrate what RBS's actual

holdings were—something they do not do.

Finally, Plaintiffs point to resignations of RBS officers and directors and government

investigations as raising a strong inference of scienter.  (CAC ¶¶ 297-306).  But the

investigations Plaintiffs cite relate to RBS's underwriting and securitization business practices,

not to the way it valued assets on its balance sheet.  Thus, these cannot be used as a basis to infer

that the statements Defendants made with respect to RBS's balance sheet and asset valuations

were fraudulent.  For executive resignations to raise a strong inference of scienter, they must be

"highly unusual and suspicious."  Glasser v. The9, Ltd., 772 F. Supp. 2d 573, 598 (S.D.N.Y.

2011).  In the instant case, the resignations of RBS officers after effective nationalization by the

British Government and large losses are at least as consistent with punishing those at the helm

for their poor judgment and leadership, than resignations relating to concocting a scheme to defraud shareholders.

### The '33 Act Claims

Plaintiffs allege violations of § 11 of the '33 Act against all Defendants (CAC ¶ 99), § 12(a)(2) against the '34 Act Defendants and RBS (Id. ¶ 111), and § 15 against the '34 Act Defendants (Id. ¶ 124). They allege that the Exchange Offer Documents contained false statements and omissions relating to ABN AMRO due diligence (Id. ¶¶ 76-82) and RBS's subprime exposure (Id. ¶¶ 83-94), and that the Exchange Offer Documents included RBS's false and misleading financial statements (Id. ¶¶ 95-97). Defendants argue that Plaintiffs fail to state a claim under the '33 Act because they fail to plead any material falsity with respect to the ABN AMRO transaction and RBS's subprime exposure, they fail to state any claim at all with respect to RBS's financial statements, and they fail to plead loss causation. (RBS Br. at 35-51).

Because the Plaintiffs' '33 Act claims sound in fraud, they must meet the heightened pleading standards of Rule 9(b). To meet this standard, Plaintiffs must explain why the statements were fraudulent. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). As Plaintiffs fail to include any discussion as to why the statements that form the basis for their '33 Act claims were fraudulent, Plaintiffs' '33 Act claims must be dismissed on this basis alone. See In re China Valve Secs. Litig., No. 11 Civ. 796, 2012 WL 4039852 (S.D.N.Y Sept. 12, 2012) (dismissing '33 Act claims that sounded in fraud solely because they failed to meet the particularity standard of Rule 9(b)).

17

Even under the lower standard of Rule 8(a), Plaintiffs' '33 Act claims fail.[9] To state a claim under § 11, a plaintiff must claim that "(1) she purchased a registered security . . .; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)). Section 12(a)(2) imposes liability when a person who offers or sells a security "by means of a prospectus or oral communication" makes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77(a)(2). Section 15 imposes control person liability when there is an underlying primary violation of either §§ 11 or 12(a)(2). See Id. § 77o.

Plaintiffs' first claim arises out of alleged misstatements and omissions relating to ABN AMRO due diligence. Plaintiffs claim that the Exchange Offer Documents represented to investors that RBS continued to do due diligence after May 2007, through the acquisition's close in October. (CAC ¶¶ 76-82). They point to statements in the Exchange Offer Documents that refer to a series of meetings that RBS officials had with counterparts at ABN AMRO in August and September in which they discussed "due diligence matters generally." (Id. ¶ 76).

These statements, as previously discussed, were not literally false. Plaintiffs do not allege that these meetings did not happen. A close reading of these statements does not indicate that RBS continued to conduct due diligence, but only that meeting participants discussed due

---

[9] Judge Batts employed the lower standard of Rule 8(a) in dismissing what remained of the Zemprelli complaint for failure to state a claim. (See No. 09 Civ. 300, Dkt No. 230 at 11-12).

diligence matters.  The Exchange Offer Prospectus makes clear that the due diligence with respect to the transaction occurred earlier in the year, and that it was limited.  (July 20, 2007 Form F-4, at 46 states that RBS had "conducted only a limited review of ABN AMRO and, therefore, we may become subject to unknown liabilities of ABN AMRO, which may have adverse effects on our financial condition and results of our operations.").

Second, Plaintiffs claim that the Exchange Offer Documents failed to disclose RBS's exposure to subprime and other credit market assets.  (Id. ¶¶ 83-94).  Plaintiffs allege that the year-end 2006 and mid-year 2007 financial statements incorporated by reference misled Exchange Offer participants as to the nature and extent of RBS's subprime holdings because they represented that RBS had a "traditional unwillingness to engage in subprime lending" and that "portfolio risk remained stable and the corporate credit environment remained benign."  (Id. ¶¶ 85, 88).

These statements, however, appear to be neither false nor actionable.  Plaintiffs do not plausibly allege, for example, that on June 5, 2007, that the corporate credit environment was not stable.  (Id. ¶ 87).  Instead, Plaintiffs offer conclusory allegations that "market indicators" demonstrated that the period between March 1, 2007 and October 1, 2007 was not a benign corporate credit environment without stating which indicators they reference.  (Id. ¶ 93).  For these statements to be actionable, they need to have been false at the time.  With the benefit of hindsight, Plaintiffs cannot establish falsity by simply pointing to the credit crisis and making conclusory allegations that because RBS ultimately was forced to take $11 billion in credit market write-downs, its earlier statements about portfolio risk were necessarily false.

The Second Circuit's recent decisions in Fait v. Regions Financial Corp. and City of Omaha, NE Civilians Emps. Ret. Sys. v. CBS Corp. make this clear.  "[W]hen a plaintiff asserts

a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." <u>Fait</u>, 655 F.3d 105, 110 (2d Cir. 2011). Allegations that Defendants should have known that their valuations were inaccurate no longer suffice. This applies to Plaintiffs' claims about RBS's holdings with equal weight, as all of Plaintiffs' claims relate to the dollar value of RBS's complex securitized holdings, which requires valuation. <u>See In re Deutsche bank AG Secs. Litig.</u>, No. 09 Civ. 1714, 2012 WL 3297730 at *2 (S.D.N.Y. Aug. 10, 2012). Plaintiffs fail to allege that RBS's valuations were objectively false or that any Defendant disbelieved them at the time. <u>See</u> <u>NECA-IBEW Pension Trust Fund v. Bank of America Corp.</u>, No. 10 Civ. 440, 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) (dismissing similar claims for failing to plead any facts that might show that the beliefs defendants held at the time were different from those in their public statements).[10]

Lastly, Plaintiffs claim that RBS's financial statements were false and misleading and violated IFRS accounting standards. (<u>Id.</u> ¶¶ 95-97). These claims are largely derivative of and intertwined with Plaintiffs' claims regarding the way RBS valued its securitized portfolio. This Court has already rejected those claims. As discussed in <u>Fait</u>, valuing complex, illiquid instruments with thousands of underlying mortgage loans is not a straightforward exercise, and Plaintiffs do not allege that RBS's valuations were objectively false or that any Defendant disbelieved them at the time.

---

[10] Judge Batts dismissed nearly identical claims in <u>Zemprelli</u> on similar grounds, holding that plaintiffs' "alleged failed disclosure of subprime exposure and risk concentration do not amount to a material misstatement or omission under the Securities Act." (No. 09 Civ. 300, Dkt. No. 230 at 19).

### Control Person Liability

Plaintiffs' claims under § 20(a) of the '34 Act and § 15 of the '33 Act must also be dismissed. To plead a claim under either section, a plaintiff must adequately plead an underlying violation. See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206-07 (2d Cir. 2009) ('34 Act); In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004) ('33 Act). As Plaintiffs have not made out an underlying violation of either the '33 Act or the '34 Act, these control person claims necessarily fail.

### The Plaintiffs' Claims Are Untimely

1. The '33 Act Statute of Limitations

Plaintiffs' claims under the '33 Act are subject to a one-year statute of limitations. 15 U.S.C. § 77m. "The limitations period begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 827 (S.D.N.Y. 2010). Resolution of the date at which the statute of limitations should have begun to run can be an issue appropriate at the motion to dismiss stage when the facts needed for its determination can be gleaned from the complaint and related documents. LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003).[11]

---

[11] Plaintiffs urge this Court to apply the Supreme Court's interpretation of the statute of limitations for the '34 Act in Merck & Co. v. Reynolds, __ U.S. __, 130 S. Ct. 1784 (2010) to the '33 Act. In Merck, the Court interpreted the '34 Act's limitations period to start running "not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 174 (2d Cir. 2011) (interpreting Merck). Merck abrogated the lower "inquiry notice" standard that this Circuit had previously applied to the '34 Act's statute of limitations. The Second Circuit, however, has not had the opportunity to determine whether Merck also applies to the '33 Act. See In re Barclay's Bank PLC Secs. Litig., 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011), citing Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 480 (S.D.N.Y.

The burden is on Plaintiffs to affirmatively plead compliance with the statute of limitations because it is a substantive element of the cause of action.  Bresson v. Thomson McKinnon Secs., Inc., 641 F.Supp. 338, 343 (S.D.N.Y. 1986).  To do so, Plaintiffs must set forth (1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier; and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery.  In re Integrated Resources Real Estate Ltd. P'ships Secs. Litig., 815 F.Supp. 620, 631 (S.D.N.Y. 1993).

Plaintiffs allege that they were not put on notice of facts constituting the alleged violations until January 19, 2009, because it was only then that RBS admitted the extent of its subprime and other credit market exposures for the first time.  (CAC ¶ 222).  Plaintiffs claim that while RBS revealed that it was involved in subprime securitizations and held some subprime ABS and CDOs on its books, RBS did not make the market aware of the full extent of its holdings until its "shocking announcement" on that date.  (Id. ¶ 297).  Plaintiffs clearly explain in their brief that they "could not have discovered facts constituting the violations at issue in this case before the January 19, 2009 revelations, at the earliest."  (Plaintiff Resp. at 33) (internal quotations omitted, emphasis added).  By contrast, Defendants argue that the limitations period should have begun to run on December 6, 2007, when RBS filed a form 6-K trading statement with the SEC.  This form detailed RBS's then-exposure to subprime assets on its own balance sheet and those it had taken on in the ABN AMRO transaction.  Defendants contend that it was

---

2010).  Therefore this Court will continue to apply the inquiry notice standard, consistent with other courts in this district, although for purposes of this case, it does not matter as Plaintiffs have failed to plead compliance with the statute of limitations under either test.  See Freidus, 736 F.3d at 827; Barclays, 2011 WL 31548 at *6; Pub. Emps.' Ret. Sys. of Mississippi v. Goldman Sachs Group, Inc., 280 F.R.D. 130, 140 (S.D.N.Y. 2012).

at this time that Plaintiffs were put on notice of and should have investigated RBS's
securitization portfolio.

The Plaintiffs' date of first discovery is not just implausible, it is impossible. Plaintiffs'
contention that January 19, 2009 was the very first time at which they could have discovered that
RBS was misleading investors about its exposure to subprime is undermined several deficiencies
in the CAC. First, Plaintiffs claim that they were party to a prior suit in this district, until Judge
Batts dismissed their claims for lack of standing. Zemprelli v. The Royal Bank of Scotland
Group PLC et al. (Dkt. No. 09-300). While this may be part of their relation back and tolling
arguments,[12] it undermines their contention that they could not have known about RBS's alleged
misstatements and omissions until January 19, 2009. The original Zemprelli complaint was filed
on January 12, 2009 and contained many of the same fraudulent claims. (See No. 09 Civ. 300,
Dkt. No. 1). The original Zemprelli complaint alleged false statements relating to RBS's fixed
income valuations and the ABN AMRO transaction, the same claims Plaintiffs allege in this
case. (See Id. ¶¶ 5, 65). Plaintiffs cannot simultaneously have their complaint tolled or related
back to the January 12, 2009 Zemprelli complaint (as they claim they do, see Def. Resp. at 36)
while at the same time alleging that they could not have brought their complaint at all before
January 19, 2009.

The second reason Plaintiffs' alleged trigger date is not plausible is that even by January
16, 2009 (the Friday before the disclosure), the price of RBS's ADRs had declined from the
exchange price of $219.60 to $10.85 (CAC ¶ 157). It is simply not plausible that a share price
decline of 95% in a 15-month period could pass without shareholders being put on notice that a

---

[12] The date of an amended pleading is deemed to relate back to the date of the original filing where the amended
pleading arises out of the same "conduct, transaction or occurrence" set out in the original pleading. Fed. R. Civ. P.
15(c)(1)(B).

reasonably diligent investigation may reveal a problem with the company. Throughout late 2007 and 2008—when some of the largest banks in the world failed because of their exposure to securitized assets—it was common knowledge that these large banks had over-exposed themselves to lower quality assets. This is similarly true for RBS, who stated unequivocally as early as December 6, 2007 that it was involved in securitizing U.S. subprime mortgages. (Id. ¶¶ 16, 271).

Third, the CAC does not allege any specific new information that came to light on January 19, 2009 that it otherwise would not have been able to glean prior to that date. In order to affirmatively plead compliance with the statute of limitations, Plaintiffs must set forth the reasons why an earlier investigation would not have uncovered the information that came out on January 19, 2009. Integrated Resources, 815 F.Supp. at 631. Plaintiffs fail to carry this burden. The gravamen of Plaintiffs' CAC is that the large write-down announced on January 19, 2009 exposed the falsity of all of Defendants' prior statements concerning their holdings and the ABN AMRO acquisition. Plaintiffs do not point to any specific information RBS subsequently revealed in connection with that loss that was previously unavailable to them, or could not have been discovered in the course of a reasonable investigation.[13]

Even accepting the Plaintiffs' January 19, 2009 date does not automatically cure the Plaintiffs' timeliness problem, as they did not file their first complaint in this action until January

---

[13] The December 6, 2007 trading statement by itself may not have given Plaintiffs the facts that they would have needed to determine whether RBS was misstating its subprime exposure per se, although it certainly did put investors on notice that RBS was involved in securitization and held securitized assets. Plaintiffs even incorporate former CEO Sir Frederick Goodwin's December 6, 2007 statement that "we knew what [RBS] Greenwich was doing and we're in the risk-taking business" in several paragraphs of their CAC. (See, e.g. CAC, ¶¶ 27, 163). In the context of the increasingly turbulent securitized credit markets of late 2007 and 2008, notice that a large bank was involved in securitized transactions was enough to put Plaintiffs on inquiry notice. See In re Barclays Bank, PLC Secs. Litig., 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011).

19, 2011, a full two years later.  Plaintiffs argue that their '33 Act claims were tolled under the American Pipe doctrine by the Zemprelli complaint because it asserted claims on behalf of purchasers of RBS ADRs.  Defendants argue that tolling should not apply because the ADR Plaintiffs were dismissed for lack of standing because the ultimately named Plaintiffs in Zemprelli did not actually purchase any ADRs.  This point, however, is rendered moot by Plaintiffs' failure to meet their burden to plausibly plead compliance with the statute of limitations.[14]  As Plaintiffs did not meet their burden to properly allege compliance with the statue of limitations, their '33 Act claims should be dismissed on these grounds alone.

## 2. The '34 Act Statute of Limitations

Plaintiffs' '34 Act claims are subject to a 2-year statute of limitations.  28 U.S.C. § 1658.  As discussed above, the Supreme Court held in Merck that the limitations period begins to run only after "a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation."  Merck, 130 S. Ct. at 1798.  The Second Circuit has interpreted this as starting the limitations period "when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation."  City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 174 (2d Cir. 2011).  For the same reasons set out

---

[14] This Court need not opine on whether Plaintiffs' claims would have been tolled.  There is no Second Circuit or Supreme Court case on point, and courts in this District are divided.  There is no conclusive authority in this Circuit regarding whether American Pipe applies to claims that are ultimately dismissed for lack of standing.  District courts have found in both directions.  See N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 2010 WL 6508190 (S.D.N.Y. Dec. 15, 2010) (no tolling); but see In re Morgan Stanley Mortg. Pass-Through-Certificates Litig., 810 F. Supp. 2d 650 (S.D.N.Y. 2011) (applying tolling).  Given Plaintiffs' failure to meet their pleading burden, there is no need to resolve this issue at this time.

above, Plaintiffs fail to plausibly plead compliance with the statute of limitations, and Plaintiffs'

CAC should be dismissed on these grounds alone.

## Conclusion

RBS's and the Individual Defendants' motions to dismiss for failure to state a claim

under Rule 12(b)(6) are GRANTED (Dkt Nos. 83, 85. Granting these motions renders

Defendants' motion to dismiss under the forum non conveniens doctrine moot (Dkt No. 74).

Plaintiffs' motion to strike is DENIED (Dkt. No 102).[15]  The Clerk of the Court is directed to

close this case.


Dated: New York, New York
        September 27, 2012

                                        SO ORDERED:

                                        _George B Daniels_

                                        GEORGE B. DANIELS
                                        United States District Judge


---

[15] "[M]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C., 288 F. Supp. 2d 473, 481 (S.D.N.Y. 2003). The exhibits in Defendants' declaration largely consisted of public filings that are proper for consideration of a motion to dismiss. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). Any material that this Court deemed improperly before it was simply ignored.