UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LIGHTHOUSE FINANCIAL GROUP, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:11-cv-00398-GBD <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
| vs. | : : | |
| THE ROYAL BANK OF SCOTLAND GROUP, PLC, et al., | : : : | |
| Defendants. | : : | |
| ETHAN GOLD, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:11-cv-01162-NRB <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
| vs. | : : | |
| THE ROYAL BANK OF SCOTLAND GROUP, PLC, et al., | : : : | |
| Defendants. | : : | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR RECONSIDERATION OF THE COURT'S MEMORANDUM
DECISION & ORDER DATED SEPTEMBER 27, 2012

778009_1

## TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................................................1

II. ARGUMENT .............................................................................................................................3

    A. Plaintiffs' Overlooked Request for Leave to Amend Warrants Reconsideration..................................................................................................................3

    B. Plaintiffs Should Be Given the Opportunity to Amend the Consolidated Complaint...............................................................................................................................5

        1. An Amended Complaint Would Enable Plaintiffs to Identify RBS's Admissions of Its Actual Credit Market Holdings ..........................6

        2. The FSA Report Provides Precisely the Kind of Facts the Court's Order Found Lacking in the Consolidated Complaint .................................7

        3. An Amended Complaint Would Clarify Any Confusion Regarding the Timeliness of Plaintiffs' 1934 Act Claims..........................................10

III. CONCLUSION.......................................................................................................................11

# TABLE OF AUTHORITIES

Page

**CASES**

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...................................................................................2, 5

*Ferber v. Travelers Corp.*,
785 F. Supp. 1101 (D. Conn. 1991) .............................................................................4, 5

*Foman v. Davis*,
371 U.S. 178 (1962) ..........................................................................................................4

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ............................................................................6

*Luce v. Edelstein*,
802 F.2d 49 (2d Cir. 1986) ...............................................................................................2

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990) .............................................................................................5

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*,
748 F.2d 774 (2d Cir.1984) ..............................................................................................5

*S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Dev. Fund Co.*,
608 F.2d 28 (2d Cir.1979) ................................................................................................5

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009),
*aff'd*, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) .........................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..........................................................................................................8

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b) ...............................................................................................................................6

Federal Rules of Civil Procedure
Rule 9(b) ......................................................................................................................1, 2
Rule 59(e) ..........................................................................................................................5
Rule 60(b) .........................................................................................................................5

**Page**

S.D.N.Y. Local Civil Rules
    Rule 6.3 ................................................................................................................1, 3, 5

**SECONDARY AUTHORITIES**

C. Wright, A. Miller & M. Kane,
    6 *Federal Practice and Procedure: Civil* (1990 & Supp. 1991)
    §1487............................................................................................................................5

2A J. Moore & J. Lucas,
    *Moore's Federal Practice* (2d ed. 1986) ...................................................................2

2A Moore & Lucas,
    *Moore's Federal Practice* (2d ed. 1989) ...................................................................5

Pursuant to Local Civil Rule 6.3, Lead Plaintiffs respectfully submit this memorandum of law in support of their motion for reconsideration of the Court's Memorandum Decision & Order, dated September 27, 2012 (the "Order"; Docket No. 154), granting defendants' motion to dismiss Plaintiffs' Consolidated Amended Complaint ("Consolidated Complaint"), which resulted in a clerk's judgment being entered on September 28, 2012.

## I.  PRELIMINARY STATEMENT

Early on at the July 19, 2012 hearing on defendants' motion to dismiss, plaintiffs' counsel made the following request:

> I wanted to point out early on . . . the FSA comes out with a report, a very detailed report.
>
> I have it right here.  It is several hundred pages long.  It is 450 pages long about RBS, and this came out after we filed our amended complaint, and it contains a lot of information that is very helpful to us. . . .
>
> *   *   *
>
> I just want to make the point that should any part of our complaint, should you find any part of our complaint to be insufficient, I think out of fairness we ought to have the opportunity to amend based on what is in the FSA report.

*See* Reporter's Transcript of Proceedings, July 19, 2012 Hearing, at 83 (hereinafter "RT").

The briefing on defendants' motion to dismiss spanned hundreds of pages.  The hearing on it lasted an entire day.  Defendants filed four more briefs ***after*** the hearing, and plaintiffs responded with two of their own.  And the task before the Court was further complicated by a ruling in another case that related to the Securities Act of 1933 ("1933 Act") claims here, but had nothing do with the Securities Exchange Act of 1934 ("1934 Act") claims.  Overlooked in all of this activity was plaintiffs' request for leave to amend.

The Court's September 28, 2012 Order granting defendants' motion to dismiss was based largely on the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities

Litigation Reform Act of 1995 ("PSLRA"). *See* Order at 7-8. Due to the designed difficulty of meeting these standards, "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice*, ¶9.03 at 9-34 (2d ed. 1986)); *see also Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "'with extreme liberality,'" especially in securities fraud cases) (citation omitted). But the Court's Order did not address plaintiffs' request for leave to amend.

Not only is leave to amend the presumptively appropriate next step in this litigation, it is substantively imperative. The specific facts and evidence set forth in the FSA Report – which was released the month ***after*** plaintiffs filed their first amended complaint and the month ***before*** defendants' filed their motion to dismiss – will enable plaintiffs to cure the infirmities noted by the Court. Plaintiffs' amended complaint would also streamline the claims by dropping all 1933 Act claims, as well as all claims against three of the five individual defendants, leaving only Frederick A. Goodwin and John Cameron, in addition to The Royal Bank of Scotland Group, plc ("RBS"). Incorporating the newly-discovered facts and evidence from the FSA Report and exclusively focusing on 1934 Act claims and defendants RBS, Goodwin, and Cameron (whom the FSA banned for life from any full-time employment in the financial services industry) will cure each of the bases for the Court's dismissal Order: (i) identifying where defendant RBS admitted materially higher-than-reported credit market holdings (Order at 5, 16); (ii) pleading particularized facts that demonstrate defendants' knowledge and recklessness (*see id.* at 13-15); and (iii) confirming the timeliness of the 1934 Act claims (*id.* at 25-26). Therefore, plaintiffs respectfully request that the Court reconsider its Order and grant plaintiffs leave to file a Second Consolidated Amended Complaint.

## II.     ARGUMENT

### A.     Plaintiffs' Overlooked Request for Leave to Amend Warrants Reconsideration

Local Civil Rule 6.3 requires a party seeking reconsideration to "set[] forth concisely the matters or controlling decisions which counsel believes the Court has overlooked." S.D.N.Y. Local Civil Rule 6.3.  Because plaintiffs did not have the benefit of the FSA Report at the time they filed the Consolidated Complaint, plaintiffs' opposition expressly identified the report as the basis for a request for leave to amend "to the extent the Court finds any of plaintiffs' claims infirm." *See* Plaintiffs' Memorandum of Law in Opposition to Defendant Royal Bank of Scotland Group plc's Motion to Dismiss the Consolidated Amended Complaint at 4 n.2 (Dkt. No. 96).  Plaintiffs' counsel reiterated this request, and the basis for it, early in his argument at the hearing on defendants' motion to dismiss:

> I wanted to point out early on is, and I think I am sure you're aware of it, but the FSA comes out with a report, a very detailed report.
>
> I have it right here. It is several hundred pages long.  It is 450 pages long about RBS, and ***this came out after we filed our amended complaint***, and ***it contains a lot of information that is very helpful to us***.  Before they, in connection with their investigation, it is also important to understand that they entered into a settlement with Johnny Cameron, who is one of the defendants, okay?
>
> ***Johnny Cameron is now barred from life from the financial services industry as a result of the FSA investigation***.  The FSA is operating under English law looking at different, you know, various issues.  They weren't doing any sort of examination of the U.S. federal securities laws.  They weren't looking at statements to see if there are misstatements of material fact.  They did their own investigation, but there is lots of information in there that parallels what we allege.
>
> I just want to make the point that should any part of our complaint, ***should you find any part of our complaint to be insufficient, I think out of fairness we ought to have the opportunity to amend based on what is in the FSA report***.

RT at 83 (emphasis added).

In another securities case, *Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991), the court faced a similar situation:

> In its ruling, the court in fact did not address what the plaintiffs term their "explicit" request for leave to amend. Yet this oversight comes as no surprise. The plaintiffs' request for leave to amend was buried in footnote seven on page thirty seven of their memorandum in opposition to the motion to dismiss. The obscure placement of this request was made even more obscure by the hundreds of pages of submissions the court reviewed in preparation for ruling on the motion to dismiss, and the failure of plaintiffs' counsel to raise the request during nearly two hours of oral argument. The court suggests that, in the future, counsel for the plaintiff move in a more explicit, distinct fashion under Rule 15(a).

*Id.* at 1112.

Notwithstanding counsel's failure to raise the request for leave during oral argument, the *Ferber* court recognized that it had overlooked the request, and that "[u]nder Rule 15(a), 'leave [to amend] shall be freely given when justice so requires,' and should be granted absent 'some justification for refusal.'" *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Accordingly, the court granted the plaintiffs' motion for reconsideration and request for leave to file an amended complaint.

Though certainly understandable, there is no doubt that the Court's Order here overlooked plaintiffs' request for leave to amend. Moreover, unlike the situation in *Ferber*, plaintiffs' counsel here **did** raise the request for leave to amend during oral argument – at length and cogently. In addition, the first request for leave was submitted only three months after the release of the FSA Report. Further, plaintiffs' motion for reconsideration is timely. Thus, there is "no undue delay, bad faith, a dilatory motive or undue prejudice to be engendered by the amendment" sought here. *Ferber*, 785 F. Supp. at 1112.

### B. Plaintiffs Should Be Given the Opportunity to Amend the Consolidated Complaint

"When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'" *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (quoting 2A Moore & Lucas, *Moore's Federal Practice*, ¶12.14 at 12-99 (2d ed. 1989)). "Adherence to these principles is especially important in the context of the PSLRA. The PSLRA requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail giving rise to a strong inference of deliberate recklessness." *Eminence Capital*, 316 F.3d at 1052 (internal quotation omitted).

Moreover, "[w]hile futility of amendment may be one ground upon which a motion for leave to amend may be [denied], this basis generally has been narrowly construed in the Second Circuit." *Ferber*, 785 F. Supp at 1112 (internal citation omitted) (citing *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 783 (2d Cir.1984); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42-43 (2d Cir.1979); C. Wright, A. Miller & M. Kane, 6 *Federal Practice and Procedure: Civil*, §1487 at 637-42 (1990 & Supp. 1991) (proposed amendment should be "clearly futile" for denial of leave to amend)). Here, leave to amend would not be futile, let alone clearly so, because the FSA Report and a more-concise complaint would enable plaintiffs to cure each of the infirmities this Court's Order listed.[1]

---

[1] Although plaintiffs respectfully disagree with the Court's findings regarding the Consolidated Complaint, pursuant to Local Rule 6.3, this motion for reconsideration is limited to the "matter" of plaintiffs' overlooked request for leave to file an amended complaint. If necessary, plaintiffs intend to file a broader motion under Fed. R. Civ. P. 59(e) and 60(b).

### 1. An Amended Complaint Would Enable Plaintiffs to Identify RBS's Admissions of Its Actual Credit Market Holdings

Regarding plaintiffs' 1934 Act claims concerning RBS's misrepresented credit market holdings, the majority of the Court's analysis is aimed at RBS's ***valuation*** of its holdings (*i.e.*, the percentage by which RBS was writing down the holdings on its books). *See* Order at 15-16 ("[t]he problem that permeates Plaintiffs' [Consolidated Complaint] with respect to its valuation claims is that Plaintiffs do not plead sufficient facts that would demonstrate that Defendants were aware that declines in these broad market indicators should have a direct effect on the specific assets RBS owned"; "Plaintiffs further fail to allege that RBS thought that its own assets were risky, or that RBS disbelieved its valuations, but deliberately issued statements to the contrary. Plaintiffs simply point to post-class period statements that indicate that RBS made large valuation mistakes.").

Although plaintiffs respectfully disagree with the Court's conclusions regarding the Consolidated Complaint's valuation allegations, we will forego such claims in order to preserve and buttress claims regarding RBS's misrepresented credit market ***holdings***. *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 235 (S.D.N.Y. 2010) (finding defendants' misrepresentations regarding scope of Citigroup's CDO holdings actionable under §10(b)). These claims cannot be credibly disputed, but they have been blurred and misconstrued, which likely contributed to the Court's disposal of them "because Plaintiffs plead no facts that demonstrate where they obtained their actual estimated exposures." *See* Order at 16; *see also id.* at 5. This is a prototypical example of perceived defect that could be cured in an amended complaint.

Not only would an amended complaint make crystal clear where plaintiffs obtained RBS's actual exposure figures (from RBS's own reports), but it would also put to rest the notion that RBS was misrepresenting only "estimated exposures." For example, the only "estimates" in the table of RBS's first purported acknowledgement of its comprehensive credit market exposures were the

write-down percentages (*i.e.*, the "Average price %") that RBS applied to its actual booked holdings. *See* Declaration of Jason A. Forge in Support of Plaintiffs' Motion for Reconsideration of the Court's Memorandum Decision & Order Dated September 27, 2012 ("Forge Decl."), Ex. 1. So, for example, RBS *estimated* that its high-grade CDOs were worth 84% of the face values actually on its books. *Id.* The remaining 16% would represent how much of these CDOs RBS had written off. In other words, RBS represented that the ***CDOs and subprime RMBS on its books*** "net of hedges and write-downs" amounted to £5 billion ($10 billion) as of December 31, 2007. *Id.* In truth, however, as RBS would later admit, as of December 31, 2007, RBS had on its books almost double that amount of CDOs and subprime RMBS ***net of the exact same hedges and write-downs***.[2] Likewise, RBS misrepresented its holdings as to other self-described "credit market exposures," including additional CDOs and subprime RMBS covered by financial guarantors, as well as CLOs. RBS represented that it had £3.9 billion ($7.8 billion) of holdings in these assets, when in reality it had more than three times that amount. *Id.* Moreover, an amended complaint would not only identify where RBS made this subsequent admission, it would ***show*** the admission, utilizing an image of the very document containing it.

### 2. The FSA Report Provides Precisely the Kind of Facts the Court's Order Found Lacking in the Consolidated Complaint

Of course, in addition to showing that RBS's credit-market disclosures were false, plaintiffs' allegations have to give rise to a "strong inference" of scienter – *i.e.*, one that a reasonable person

---

[2] This is no different than if a car dealership were to say, as of December 31, 2011, our inventory of 2011 vehicles is worth 84% of what we have on our books, which amounts to $840,000. Years later, the dealership admits that, in truth, as of December 31, 2011, 84% of the 2011 vehicles on its books amounted to $1,680,000. Without questioning the reasonableness of the 84% estimate, it would be clear that the dealership had falsely understated its inventory of 2011 vehicles (and thus evaded taxes due on their actual inventory).

- 7 -

would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The evidence contained in the 450-plus page FSA Report reveals specific, ***contemporaneous*** facts that will, in an amended pleading, establish the requisite inference of scienter as to RBS's credit market holdings. Consider the following examples:

> According to GBM [Global Banking and Markets] senior managers, in 2006 there was a clear impetus from the Board to focus on organic growth, which involved expanding significantly in those areas where RBS considered itself to be behind its peers and to be more aggressive and ambitious in its outlook. The desire for a more ambitious approach is demonstrated in an email from Mr. Crowe (GBM CEO) in June 2006 which stated:
>
>> "[T]he Board has been very bullish over the last 24 hours across all the GBM business in wanting to avoid the defensiveness in approach that we tend to adopt, and to be more aggressive and ambitious."

*See* Forge Decl., Ex. 2 at 369, ¶67.

> Mr. Cameron's role [in GBM], however, was not that of a non-executive. He was closely involved in some aspects of the business and when he identified possible issues he became engaged in them; for example, ***when the sub-prime crisis emerged he was active in requesting information and furthering his understanding of the risks and products***.

*Id.* at 368, ¶64 (emphasis added).

> Mr. Crowe and Mr. Cameron were responsible for submitting reports to the RBS Board and both were members of the GEMC [Group Executive management Committee]. Mr. Cameron was also a member of the RBS Board. . . . ***[A]s the only representative of GBM on the Board, Mr. Cameron was in a unique position to provide input to the Board as to how markets were affecting the GBM business***.

*Id.* at 369, ¶65 (emphasis added).

> In response to more uncertain trading conditions [in the structured credit markets], increasingly detailed management information was provided by GBM to GEMC and the RBS Board in its monthly Performance Highlights report beginning in May 2007.

*Id.* at 386, ¶124.

> At that stage GBM management was still unclear about the extent to which CDOs were impacted by difficulties in the sub-prime market and *was paying increasing attention to the subject*. For example, on 14 May 2007, Mr. Cameron asked Mr. Crowe for an explanation of why the daily profit and loss summary for debt capital markets was worse than asset-backed securities and in particular "how much leakage of sub-prime into CDO business? . . . *I'd like to be clear in the truth circle before thinking what to say to others* who currently think our issue is all abs." Mr. Crowe responded stating "CDO is all sub prime related."

*Id.* at 387, ¶124 (emphasis in original).

> *RBS's focus on the retained [CDOs] became more acute in July 2007*. A draft memorandum dated 20 July was prepared for RBS senior management which included full details of GBM's exposure to CDOs and showed the retained super senior holdings separately.

*Id.* (emphasis added).

> During July, August and September 2007, there was significant analysis of market developments and their impact on the RBS Group. *The RBS Board was informed on 26 July 2007 that mark-downs of US$240m had been taken in respect of RBS Greenwich Capital's super senior CDOs on 30 June 2007 and in September that further mark-downs of US$185m had been taken in July 2007*.

*Id.* (emphasis added).

> The August 2007 Group Risk Management Report presented to GEMC on 28 August, as well as to the RBS Board, *observed that the fall-out from the US sub-prime mortgage market* meant that the portfolio of super seniors held by RBS Greenwich Capital had suffered from *reduced liquidity* and limited price observability.

*Id.* at 387-88, ¶124 (emphasis added).

> On 8 November 2007 the Managing Director for Risk Management at RBS Greenwich Capital, Victor Hong, resigned. His resignation letter [forwarded to Cameron] states "my expected oversight and sign off responsibilities for monthly price verification would be intolerable, based upon persistent discrepancies between trader marks and analytical fair market values."

*Id.* at 389, ¶131.

Just these few examples demonstrate that RBS's Board, which included defendants Goodwin and Cameron, was increasingly focused on, and informed about, RBS's credit market holdings in the months leading up to RBS's false statements regarding the amounts of these holdings. The internal,

- 9 -

778009_1

heightened focus and emphasis on the products of a business unit that was the single greatest contributor to RBS's profits[3] at a time when the market was intensely focused on such holdings supports a strong inference of defendants' knowing or reckless conduct regarding the falsity of RBS's related disclosures.  *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1183 (9th Cir. 2009), *aff'd*, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) ("withholding reports of adverse effects of and lawsuits concerning the product responsible for company's remarkable sales increase" such "'an extreme departure from the standards of ordinary care,'" inference that officers "withheld the information intentionally or with deliberate recklessness is at least as compelling as the inference that [they did so] . . . innocently") (citation omitted).

### 3. An Amended Complaint Would Clarify Any Confusion Regarding the Timeliness of Plaintiffs' 1934 Act Claims

Finally, the Court's Order deemed plaintiff's 1934 Act claims untimely for the same reasons it found plaintiffs' 1933 Act claims untimely. *See* Order at 25-26.  But there was a ten-month period during which there were no 1933 Act claims pending in this case (*see* Dkt. No. 152 at 3) and the limitations period for 1934 Act claims is twice as long as for 1933 Act claims. *See* Order at 21, 25. An amended complaint would eliminate all 1933 Act claims, along with any related confusion regarding the timeliness of the 1934 Act claims.  Even defendants must concede that  the ***only*** way plaintiffs' 1934 Act claims are untimely is if the "*American Pipe* tolling rule has no application to

---

[3]   "In 2006 and 2007, GBM represented 41% and 37% of RBS's [total] contribution (*i.e.*, total profit before tax and centrally allocated overheads) and 24% and 22% of RBS's [total] revenue respectively." *See* Forge Decl., Ex. 2 at 362, ¶51. "In 2006, approximately a quarter of GBM's revenues were derived from its North American operations, of which US investment bank/broker-dealer RBS Greenwich Capital (now known as RBS Securities Inc) provided the majority . . . the growth of RBS Greenwich Capital was a key factor in GBM's growth strategy for 2007 onwards . . . ." *Id.* at 363, ¶53.

the [19]34 Act claims." *See* Dkt. No. 86 at 34.  Yet, that is an argument the Court expressly declined to address.  *See* Order at 24 n.14.

### III.   CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court reconsider its Order, vacate the judgment and allow plaintiffs leave to file a Second Consolidated Amended Complaint.

DATED:  October 12, 2012      Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
THEODORE J. PINTAR
JASON A. FORGE
DARRYL J. ALVARADO


             s/ Jason A. Forge
            JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

- 11 -

CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 12, 2012.

    s/ Jason A. Forge
    JASON A. FORGE

    ROBBINS GELLER RUDMAN
      & DOWD LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101-3301
    Telephone:  619/231-1058
    619/231-7423 (fax)

    E-mail:   jforge@rgrdlaw.com

778009_1

# Mailing Information for a Case 1:11-cv-00398-GBD

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Charles H. Dufresne , Jr**
  cdufresne@sglawyers.com

- **Paul Adam Engelmayer**
  paul.engelmayer@wilmerhale.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Shauna Kathleen Friedman**
  shauna.friedman@wilmerhale.com

- **D. Seamus Kaskela**
  skaskela@ktmc.com

- **Thomas Livezey Laughlin , IV**
  tlaughlin@scott-scott.com,efile@scott-scott.com

- **David Sapir Lesser**
  david.lesser@wilmer.com,lesserda@yahoo.com

- **James Stuart Notis**
  jnotis@gardylaw.com

- **Theodore J. Pintar**
  tedp@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrea J. Robinson**
  andrea.robinson@wilmerhale.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David R. Scott**
  drscott@scott-scott.com,efile@scott-scott.com

- **Robert Walter Trenchard**
  robert.trenchard@wilmer.com

- **Curtis Victor Trinko**
  ctrinko@gmail.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Ethan Gold
,

David M. Promisloff
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
```