UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

LIGHTHOUSE FINANCIAL GROUP,      :      11 Civ. 398 (GBD)
Individually and on Behalf of All Others      :
Similarly Situated,      :
      :      ECF Case
                    Plaintiff,      :
      :
      vs.      :
      :
THE ROYAL BANK OF SCOTLAND      :
GROUP, PLC, et al.,      :
      :
                    Defendants.      :
      :
—————————————————————— x


**THE ROYAL BANK OF SCOTLAND GROUP PLC'S**
**OPPOSITION TO PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT**

# TABLE OF CONTENTS

Page

STATEMENT .................................................................................................................1

ARGUMENT .................................................................................................................3

I.  PLAINTIFFS FAIL TO MEET THEIR HEAVY BURDEN TO SHOW THAT THE
    COURT OVERLOOKED CONTROLLING FACTS OR AUTHORITIES IN
    DISMISSING THE COMPLAINT WITHOUT LEAVE TO AMEND .............................3

II. PLAINTIFFS' PROPOSED SCAC DEMONSTRATES THAT LEAVE TO AMEND
    WOULD BE FUTILE .......................................................................................9

    A.  The Proposed SCAC Fails Under The Statute of Limitations For The Same
        Reasons Applicable To The CAC ...........................................................9

    B.  The Court Has Already Correctly Rejected The "Exposures" And "Valuations"
        Allegations In The Proposed SCAC ......................................................12

    C.  The Proposed SCAC Does Not Allege Any Other Material Misstatements Against
        RBS, Goodwin, Cameron, Or McKillop...................................................17

    D.  The Proposed SCAC Cannot Plead Scienter By Relying On Material From The
        FSA Report .......................................................................................19

CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007)..................................................................................7

*Cummins, Inc. v. New York Life Ins.*,
    2012 WL 3870308 (S.D.N.Y. 2012).....................................................................6

*Ferber v. Travelers Corp.*,
    785 F. Supp. 1101 (D. Conn. 1991)......................................................................5

*Frankel v. City of New York*,
    2009 WL 4037818 (S.D.N.Y. 2009).....................................................................3

*In re Chaus Sec. Litig.*,
    801 F. Supp. 1257 (S.D.N.Y. 1992)....................................................................10

*In re Crude Oil Commodity Litig.*,
    2007 WL 2589482 (S.D.N.Y. 2007)................................................................5, 6, 7

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    273 F. Supp. 2d 351, 391 S.D.N.Y. 2003 ............................................................7

*In re Nokia Corp. Securities Litig.*,
    423 F.Supp.2d 364 (S.D.N.Y. 2006).....................................................................5

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*,
    2008 WL 4962985 (S.D.N.Y. 2008).....................................................................7

*In re Star Gas Sec. Litig.*,
    241 F.R.D. 428 (D. Conn. 2007)...........................................................................6

*In re Tamoxifen Citrate Antitrust Litig.*,
    466 F.3d 187 (2d Cir. 2006)..................................................................................5

*In re UBS AG ERISA Litig.*,
    2012 WL 1034445 (S.D.N.Y. 2012)..............................................................4, 5, 6, 7

*Lujan v. Cabana Management, Inc.*,
    2012 WL 3062017 (E.D.N.Y. 2012)......................................................................9

*Maywalt v. Parker & Parsley Petroleum Co.*,
    808 F. Supp. 1037 (S.D.N.Y. 1992)....................................................................10

*McLaughlin v. Anderson*,
    962 F.2d 187 (2d Cir. 1992)..................................................................................5

*Merck & Co., Inc. v. Reynolds*,
    -- U.S. --, 130 S.Ct. 1784 (2010) ........................................................................................11

*Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*,
    2012 WL 4513546 (S.D.N.Y. 2012) ......................................................................................6

*Trautenberg v. Weiss*,
    2008 WL 850163 (S.D.N.Y. 2008) ........................................................................................5

*USA Certified Merchants, LLC v. Koebel*,
    273 F. Supp. 2d 501 (S.D.N.Y. 2003) ...................................................................................3

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) ...........................................................................................1, 7, 8

**OTHER AUTHORITIES**

2007 RBS Annual Report, *available at*
    http://www.investors.rbs.com/download/ announcements/FYR07.pdf ..................................15

2008 RBS Annual Report, *available at*
    http://www.investors.rbs.com/download/announcements/2008_Annual_Results_26............16

Appendix 2 to 2008 RBS Annual Report, *available at*
    http://www.investors.rbs.com/download/corporate_actions/capital_restructuring/2008
    _Annual_Results_26_February_2009_Appendix_2.pdf ..................................................15, 16

December 6, 2007 RBS Trading Statement *available at*
    http://www.investors.rbs.com/download/ announcements/PcTs061207.pdf....................14, 15

Fed. R. Civ. P. 59 ..............................................................................................................1, 3, 7

Local Rule 6.3 .........................................................................................................................3

Fed. R. Civ. P. 60 .........................................................................................................1, 2, 3, 6

Fed. R. Civ. P. 15 ....................................................................................................................4

## STATEMENT

The Royal Bank of Scotland Group plc ("RBS") respectfully submits this memorandum in opposition to Plaintiffs' motion under Fed. R. Civ. P. 59(e) and 60(b) seeking to alter or amend the Clerk's judgment closing this case (the "Motion to Alter Judgment"). Because Plaintiffs attached a proposed Second Consolidated Amended Complaint ("Proposed SCAC") for the first time as an exhibit to their reply brief on their Reconsideration Motion ("Reconsideration Reply"), RBS addresses that new filing as well.

Plaintiffs' Motion to Alter Judgment should be denied because it relies on the same flawed arguments, and is subject to the same strict legal standards, as Plaintiffs' previously-filed Reconsideration Motion. The main reasons are those set forth in RBS's October 29, 2012 opposition (the "Opposition") to Plaintiffs' Reconsideration Motion, which RBS expressly incorporates herein. Both motions improperly seek to re-litigate allegations and legal theories that the Court rejected in its September 27, 2012 decision ("Order") denying Plaintiffs' procedurally improper request to file a fourth complaint. In their Motion to Alter Judgment, Plaintiffs rely heavily on the Second Circuit's decision in *Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011), but that case stands for the unremarkable proposition that a court should, under circumstances not present here, *consider* a procedurally proper motion to alter a judgment. *Williams* does not hold that a court must consider—much less *grant*—a motion for reconsideration or to alter a judgment where the plaintiff belatedly seeks to file an amended complaint based on information the plaintiff had in hand before the defendant even moved to dismiss the prior complaint, and where amendment is plainly futile. Pursuant to *Williams*, this Court may take account of both procedural default and futility, and may properly deny reconsideration on either or both grounds. That is exactly what should happen here.

In addition to Plaintiffs' procedural default, their late-filed Proposed SCAC demonstrates beyond any doubt that amendment is futile. Even a cursory review reveals that the Proposed SCAC suffers from the same failings that led the Court to dismiss the prior CAC. Most glaringly, in their Reconsideration Motion, Plaintiffs promised that a further amended complaint would allow them to address the Court's supposed "confusion" with respect to the timeliness of their '34 Act claims. Recons. Mot. at 10. Yet in their Reconsideration Reply, Plaintiffs fail even to *mention* statute of limitations, and the Proposed SCAC (now Plaintiffs' fourth try) merely repeats, essentially verbatim, the same supposed "timeliness" grounds that were alleged in the prior CAC and rejected by the Court. Any "confusion" is strictly Plaintiffs', and the Proposed SCAC, like the CAC, fails "to plausibly plead compliance with the statute of limitations," Order 26; that alone is a basis to find futility, just as it was a ground to dismiss the CAC. Similarly, as to the "exposures," "valuations," Rights Issue, and ABN claims, the Proposed SCAC seeks merely to relitigate allegations that the Court has already found deficient on multiple, independent grounds.[1] Plaintiffs do not allege any material misstatement, nor do they plead

---

[1]    Consistent with Plaintiffs' ongoing effort to engage Defendants and the Court in a game of "whack-a-mole," the Proposed SCAC does not even adhere to the representations Plaintiffs made to the Court in their Reconsideration Motion merely weeks ago. The Reconsideration Motion (at 2) promised to drop allegations concerning RBS's valuations of complex securities, and did not request leave to replead allegations concerning the ABN transaction and the Rights Issue. Yet remarkably, all of those allegations are again included in the Proposed SCAC. Plaintiffs also represented that an amended pleading would drop all individual defendants except for Messrs. Goodwin and Cameron, but the Proposed SCAC asserts a claim against Mr. McKillop too. Plaintiffs now say that "based on the FSA Report," "in the course of completing the amended complaint, it became apparent that the evidence against Thomas McKillop was too compelling to drop him from the case, as plaintiffs had intended." Recons. Reply at 7. In other words, Plaintiffs are now apparently saying that they carefully reviewed the FSA Report—which was published in December 2011 and provides their supposed basis to amend—only *after* they filed their Reconsideration Motion on October 12, 2012. The Reconsideration Motion also promised to drop '33 Act claims on behalf of participants in the October 2007 Exchange Offer, but Plaintiffs now try to smuggle those claims in again under the '34 Act, defining the Proposed SCAC class to include all ADR purchasers "on the open market. . . *including all persons who purchased [ADRs] pursuant to the [Exchange Offer]*. Proposed SCAC ¶ 2 (emphasis added). Surely at this late stage Plaintiffs are aware that participants in the Exchange Offer did not acquire shares "on the open market," but rather did so at a set exchange price that included RBS shares and cash for ABN shares—as has been extensively briefed—

2

scienter, and their citations to the FSA Report cover the same ground that the Court already rejected in dismissing the CAC.

Accordingly, the Reconsideration Motion and Motion to Alter Judgment should be denied.

## ARGUMENT

**I.  PLAINTIFFS FAIL TO MEET THEIR HEAVY BURDEN TO SHOW THAT THE COURT OVERLOOKED CONTROLLING FACTS OR AUTHORITIES IN DISMISSING THE COMPLAINT WITHOUT LEAVE TO AMEND**

As Plaintiffs acknowledge, "[m]otions to alter or amend a judgment under Rule 59(e) and for reconsideration . . . under Local Civil Rule 6.3 are governed by the same standard."  Mot. to Alter Judgment, at 2 (quoting *Henderson v. Metro Bank & Trust Co.*, 502 F. Supp. 2d 372, 375 (S.D.N.Y. 2007); *see also* RBS Opposition at 15 n. 11.  Thus, regardless of the Rule invoked, Plaintiffs cannot avoid their "heavy burden of demonstrating that there has been an intervening change of controlling law, that new evidence has become available, or that there is a need to correct a clear error or prevent manifest injustice.'"  *Frankel v. City of New York*,  2009 WL 4037818, at *1 (S.D.N.Y. Nov. 18, 2009) (applying Rules 59(e) and 60(b); quoting *Virgin Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).[2]

Plaintiffs ignore this obligation, and instead contend that judgment should be reopened based solely on the false premise that the Court must have "overlooked" their improper,

---

and surely Plaintiffs recognize that such persons cannot avail themselves of any "fraud on the market" presumption of reliance to establish loss causation.  *See* Proposed SCAC ¶ 127.

[2]     Further, as with motions under Local Rule 6.3, "[t]he standard for granting [] a motion [under Rules 59(e) and 60] is strict, and reconsideration will generally be denied."  *Ravnikar v. Latif*, 2010 WL 4875877, at *1 (E.D.N.Y. Nov. 23, 2010).  This is because "[r]econsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  *USA Certified Merchants, LLC v. Koebel*, 273 F. Supp. 2d 501, 503 (S.D.N.Y. 2003).

informal, and conditional request to file an amended complaint.  Plaintiffs attack RBS for inferring that the Court did not overlook Plaintiffs' gambit, but instead deliberately rejected it by dismissing the case without granting leave to amend.  *See* Recons. Reply at 1, 2.  Either way, it makes no difference.  Even if the Court had "overlooked" Plaintiffs' request, that would only have been because Plaintiffs relegated it to a footnote of an opposition brief and an equally cursory mention at oral argument—taking up 12 lines of an approximately 3400 line transcript.  *See* Recons. Opp. at 7 n. 4, 9-11.  Such informal requests are no substitute for an actual motion seeking leave to replead pursuant to Rule 15, which Plaintiffs certainly knew how to file if they wanted to do so.

Numerous courts have so held.  For example, in *In re UBS AG ERISA Litigation* the plaintiffs filed a motion for reconsideration that similarly argued that the court's dismissal of their amended complaint with prejudice had "overlooked Plaintiffs' request for leave to amend," which, like Plaintiffs' informal request here, was conditional and made in a "footnote in their opposition brief to the motion to dismiss."  2012 WL 1034445, at *3 (S.D.N.Y. Mar. 23, 2012).  The court found this argument "unconvincing," explaining that "while the Court did not directly address Plaintiffs' footnoted request, it was under no obligation to do so.  Indeed, 'the law in this Circuit is abundantly clear that '[i]t is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss.'"  *Id.*  (citations omitted).

Likewise, in *In re Gildan Activewear, Inc. Securities Litigation*, the court rejected the argument that because it did not "expressly address Plaintiffs' request for leave to replead, which was made only in a footnote in their brief in opposition to the motion to dismiss," the court must have "overlooked" plaintiffs' request, warranting reconsideration.  2009 WL 4544287, at *3

(S.D.N.Y. Dec. 4, 2009).  Rather, the court explained that it is appropriate to deny such an informal request by dismissing the complaint with prejudice and recognized that such an implicit denial provides no valid basis for reopening judgment.  *Id.*  Yet another case, *In re Crude Oil Commodity Litigation*, described it as well-settled that where informal requests for leave to replead are relegated to a footnote in an opposition brief, they may be "deemed to have been waived."  2007 WL 2589482, at *3 (S.D.N.Y. Sept.7, 2007).  These decisions are all entirely consistent with the Second Circuit's decisions explaining that where the request for leave to amend is made informally, "the matter is reserved to the discretion of the district court." *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992); *see also In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006) (courts may "deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss").[3]

Moreover, as RBS explained in its Opposition (at 9-11), Plaintiffs' request is also procedurally improper based on undue delay.  The FSA Report was published in December 2011, before Defendants filed their Motion to Dismiss, yet Plaintiffs waited for the Court to rule before formally seeking to amend through a motion for reconsideration.  Contrary to Plaintiffs' assertion in their Reconsideration Reply (at 6-8), courts in this district routinely refuse to grant leave to replead where, as here, plaintiffs made a strategic decision to "hedge their bets by holding [] evidence [available prior to the entry of judgment] back in the hopes of having another

---

[3]      As these cases show, Plaintiffs' incorrectly describe *Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991), as the "lone case that has considered the same circumstances presented here."  *See* Reply at 3.  In any event, *Ferber* does not stand for the proposition, contrary to the Second Circuit authority cited above, that Plaintiffs automatically get a do-over when a court decides not to address expressly an informal request to replead.  Rather, in *Ferber* the court simply acknowledged that it had actually overlooked the plaintiffs' request to amend. 785 F. Supp. at 1112.  The court's acknowledgment of its oversight in *Ferber* has no relevance here.

bite at the proverbial apple." *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 409 (S.D.N.Y. 2006) (denying leave to amend a consolidated amended complaint where "plaintiffs' first allusion to potentially amending . . . prior to the dismissal of the action was through footnotes in their opposition brief" (internal citation omitted)); *see also In re UBS AG ERISA Litig.*, 2012 WL 1034445, at *4-5 (refusing to reconsider denial of leave to replead where "[t]he overwhelming majority of the amendments in the proposed SCAC are based on information that could have been raised not only prior to the entry of judgment . . . but also prior to the close of briefing . . . for the motion to dismiss"); *In re Crude Oil Commodity Litig.*, 2007 WL 2589482, at *4  ("we find without merit plaintiffs' attempt to now rectify the deficiencies of their dismissed Consolidated Amended Complaint, when they had many months before its dismissal to adequately do so"); *In re Star Gas Sec. Litig.*, 241 F.R.D. 428, 432 (D. Conn. 2007) (refusing to reconsider denial of leave to amend under Rules 59(e) and 60(b)) where, as here, Plaintiffs' proposed amendment relied on a "document [that] was available to [plaintiffs] during briefing on defendants' Motions to Dismiss . . . , was attached to defendants' reply briefing, and was discussed by both sides at oral argument" (citations omitted)).

Plaintiffs literally have no response to any of this authority.  In their Reconsideration Reply, they state without any explanation that they should be excused because the parties would have been required to brief a motion to dismiss even if Plaintiffs had timely sought leave to amend, and so "plaintiffs compromised by requesting leave to amend in our opposition." Reconsideration Reply at 5-6.  But Plaintiffs never discussed this unilateral "compromise" with Defendants or the Court, and there can be no reasonable dispute that if Plaintiffs had sought and obtained leave to amend, any motion to dismiss the CAC would have been considered moot. *See, e.g.*, *Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*,  2012 WL 4513546, at *1

(S.D.N.Y. Oct. 1, 2012) (granting leave to amend complaint moots motion to dismiss same); *Cummins, Inc. v. New York Life Ins.*, 2012 WL 3870308, at *2 (S.D.N.Y. Sept. 6, 2012) ("granting the motion for leave to amend moots the pending motions to dismiss"). Moreover, although Plaintiffs attempt to distinguish *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 391 S.D.N.Y. 2003)—a case which is directly on point—on the basis that, unlike here, the court in *Merrill Lynch* had previously informed the plaintiffs of certain perceived pleading deficiencies, the law is clear that Plaintiffs are not "not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (citations and internal quotation marks omitted); *see also In re Refco*, 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (pleading is not "an interactive game in which the plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges").[4]

Finally, Plaintiffs cannot avoid this result by mischaracterizing the Second Circuit's decision in *Williams v. Citigroup, Inc.*, 659 F.3d 208 (2011). In *Williams*, the Second Circuit held that it was legal error for the district court to deny a post-judgment motion seeking leave to amend *solely* because the plaintiff had not sought leave to file an amended complaint "in the first instance," *i.e.*, "immediately upon answering the motion to dismiss the complaint . . . or immediately upon receipt of the court's ruling granting the motion and prior to the entry of

---

[4]      Plaintiffs also contend that, unlike the plaintiffs in *Merrill Lynch* who only "hope[d] to find additional documents" to support their claim, they have identified a specific document which they propose to use to replead their claims. *See* Reply at 6-7. But the fact that Plaintiffs propose to replead using a document that was available *prior* any motion to dismiss cuts exactly the other way. *See, e.g., In re UBS AG ERISA Litig.*, 2012 WL 1034445, at *4-5; *In re Crude Oil Commodity Litig.*, 2007 WL 2589482, at *4. In these cases, as in numerous others, courts denied leave to replead notwithstanding—and, in part, because—plaintiffs proposed to rely on specific documents allegedly supporting their claims that were available prior to the entry of judgment.

judgment thereupon." *Id.* at 214.  That is, the Second Circuit reversed only the district court's determination that, as a matter of law, a motion to amend made after entry of judgment is *per se* improper, and remanded the case with instructions that the district court consider whether granting leave to amend might be appropriate, including on grounds of futility.  *Id.* at 214. Nothing in *Williams* supports the proposition that a plaintiff possessing facts that would allegedly provide a basis to amend may simply wait until the district court rules on the motion to dismiss before seeking to amend, nor does *Williams* hold that a court must *grant* a motion to amend under circumstances here—or even the circumstances presented in that case.  (The district court (Judge Preska) did not subsequently grant leave to amend before the parties apparently settled.)  Indeed, unlike the district court in *Williams*, this Court dismissed the CAC without leave to replead after the parties had extensively briefed the significance of the FSA's conclusions, the sole basis for Plaintiffs' informal "request" for leave to amend.  If the Court now denies Plaintiffs' Reconsideration Motion and Motion to Alter Judgment on grounds of procedural default and futility, that would be entirely consistent with *Williams* and the numerous other cases cited above.[5]

Plaintiffs offer no valid ground to revisit the Court's prior dismissal without leave to replead, and their motions should be denied on this basis alone.

---

[5]     Contrary to Plaintiffs' contentions in the Reconsideration Reply, the plaintiff in *Trautenberg v. Weiss*, 2008 WL 850163 (S.D.N.Y. Mar. 27, 2008) also made an informal, conditional request for leave to amend during the hearing on the defendant's motion to dismiss.  *See* 1:06-cv-14211, Dkt # 17, Pls.' Mem. In Supp. Of Mot. To Alter Or Amend Judgment, at 4.  And, as here, the plaintiff in *Trautenberg* sought leave to replead in order to "clarify" (*id.* at 2) allegations in their complaint that were "briefed and argued before the Court" in connection with the motion to dismiss.  2008 WL 850163, at *1.  Plaintiffs' Reconsideration Reply provides no basis to distinguish *Trautenberg*.

## II.   PLAINTIFFS' PROPOSED SCAC DEMONSTRATES THAT LEAVE TO AMEND WOULD BE FUTILE

The futility of permitting Plaintiffs to file the Proposed SCAC provides an independent basis to deny the Reconsideration Motion and the Motion to Alter Judgment.   RBS here addresses only the most glaring deficiencies of the Proposed SCAC, which establish conclusively that leave to amend would be entirely futile.   The Proposed SCAC fails to cure any of the defects that led the Court to properly dismiss the CAC with prejudice.[6]

### A.   The Proposed SCAC Fails Under The Statute of Limitations For The Same Reasons Applicable To The CAC

Plaintiffs represented in their Reconsideration Motion that, if permitted to file an amended pleading, they would cure the Court's supposed "confusion regarding the timeliness of the 1934 Act claims."   Recons. Mot. at 10.   The proposed complaint does nothing of the sort. As noted above, the Proposed SCAC includes the same boilerplate statute-of-limitations language that the Court found insufficient in the CAC.   Identical to the CAC, the Proposed SCAC says:

> This claim was brought within two years after the discovery of the fraud and within five years of the making of the materially false and misleading statements alleged herein. Moreover, each of the claims at issue in this action were alleged on behalf of a class, including plaintiffs, in *In re Royal Bank of Scotland Group plc Sec. Litig.*, No. 1:09-cv-300-DAB (S.D.N.Y.) filed January 12, 2009 (Dkt. No. 1), as well as similarly related actions, and any statute of limitations or repose applicable to this action were tolled based upon the filing of the claims in that action.

---

[6]   Because Plaintiffs improperly first attached the Proposed SCAC to their Reconsideration Reply, the Court need not consider it at all.  *See, e.g.*, *Lujan v. Cabana Management, Inc.*, 2012 WL 3062017, at *7 (E.D.N.Y. July 26, 2012) ("Arguments made for the first time on reply are deemed waived."). Nonetheless, RBS addresses its principal failings here.  RBS is prepared to provide a more comprehensive response, for example in the form of a sur-reply to Plaintiffs' Reconsideration Motion, should the Court so request.

Proposed SCAC ¶ 141; *compare* CAC ¶ 368 (same).  The sole other paragraph in the Proposed SCAC that addresses timeliness only adds "confusion," by making the same boilerplate assertions but alleging a different, narrower tolling period based on a different, later complaint filed before Judge Batts:

> The statute of limitations on plaintiffs' 1934 Act claims was tolled from at least July 15, 2009 through January 11, 2011 because throughout that time, plaintiffs were members of the defined class in a different case against RBS: "those who purchased RBS securities through several public offerings and on the open market between March 1, 2007 and January 19, 2009." *In re Royal Bank of Scotland Group plc Sec. Litig.*, No. 09 Civ. 300 (S.D.N.Y.), filed July 15, 2009 (the "*Zemprelli* case") (Dkt. No. 75 at 1).  On January 11, 2011, the 1934 Act claims in the *Zemprelli* case were dismissed due to the lead plaintiffs' lack of standing. *Id.* (Dkt. No. 158 at 21-23). On January 19, 2011, plaintiffs initiated this case by filing a complaint raising Securities Act of 1933 claims. On January 28, 2011, plaintiffs filed an amended complaint, raising their 1934 Act claims.

Proposed SCAC ¶ 16.

The Proposed SCAC asserts no facts to support the conclusory allegation that their claims satisfy the statute of limitations, and makes no cogent allegations at all about when Plaintiffs were actually on notice of their claims.  This alone is a sufficient basis to reject the Proposed Complaint as futile because it does not adequately plead conformity with the statute of limitations.  *See, e.g.*, *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1265-67 (S.D.N.Y. 1992); *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1050 (S.D.N.Y. 1992).  Such a result is particularly appropriate here, where the Court has already determined that the CAC failed to plead conformity with the same set of allegations, and further held that the alleged accrual date that Plaintiffs asserted—January 20, 2011—"is not just implausible, it is impossible."  Order at 23.

The Court's ruling was plainly correct.  As Defendants demonstrated, Plaintiffs were on notice of their claims no later than December 2007.  *See, e.g.*, Mem. in Support of Mot. to Dismiss at 27-30 (showing that claims accrued in December 2007).  The Proposed SCAC is

equally clear on this point, alleging "loss causation" events—*i.e.*, disclosure of supposed fraud—in November 2007; alleging the contents of the December 6, 2007 Trading Statement, which disclosed RBS's "subprime" exposures; and, in support of its scienter allegations, alleging that Mr. Goodwin supposedly publicly "admitted" fraud in December 2007. *See* Proposed SCAC ¶¶ 36(d), 98-103. These are the same allegations—and more—that previously led the Court to conclude correctly that Plaintiffs were on notice of claims in December 2007. *See* Order at 24 & n.13. And because the allegations in the Proposed SCAC specifically include a supposed admission of scienter, there can be no dispute that they trigger the statute of limitations under *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784, 1796-1797 (2010).[7]

In addition, the Proposed SCAC shows that the claims were not tolled. As an initial matter, the Proposed SCAC does not even agree with itself about which complaint filed before Judge Batts supposedly tolled the '34 Act claims here—another basis to reject leave to amend. But that aside, as a matter of law there was no tolling because no plaintiff before Judge Batts ever had standing to assert an ADR claim, as Judge Batts held and as Plaintiffs acknowledge. Proposed SCAC ¶ 16. A complaint that purports to be on behalf of a class of shareholders but where no plaintiff has actual standing to assert the class claims because none purchased the relevant shares does not toll the statute of limitations under *American Pipe* as a matter of law, as Defendants have previously shown and courts have held. *See, e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss at 28-30 (citing, among other authorities, *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 6508190, at *2 (S.D.N.Y. Dec. 15, 2010); *Kruse v. Wells Fargo Home Mortgage, Inc.*, 2006 WL 1212512, at *5-7 (E.D.N.Y. May 30, 2006)).

---

[7]     Moreover, even if Plaintiffs were not on notice of their claims until the January 20, 2009 date referenced in the Proposed SCAC as the *last* alleged "loss causation" event (at ¶¶ 121-123), the Proposed SCAC acknowledges that Plaintiffs did not assert any '34 Act claims in this case until January 28, 2011 (at ¶ 16), *still* more than two years later and thus outside of the most generous—and implausible and impossible—limitations period that Plaintiffs can conjure.

Accordingly, even if a complaint filed before Judge Batts *purported* to embrace equivalent '34 Act ADR claims, which RBS does not concede, there would be no tolling anyway.

Other statute of limitations and tolling issues have been fully briefed by the parties, and the Court correctly rejected Plaintiffs' arguments.  Rather than cure the untimeliness of their claims, Plaintiffs now merely seek to relitigate the same issues and the same boilerplate timeliness allegations that the parties have already addressed at length and that the Court correctly deemed insufficient.

### B.  The Court Has Already Correctly Rejected The "Exposures" And "Valuations" Allegations In The Proposed SCAC

Plaintiffs also promised that an amended complaint would "clarify" that their claims relate only to "exposure," rather than "valuation," but they do not.  Instead, the new complaint includes valuation claims just like the prior one.[8]  Moreover, the Court already considered and rejected all of these claims, after extensive briefing and argument on the topic.  *See* Order at 20 (concluding that RBS's "holdings . . . require[] valuation" and that Plaintiffs' failure to allege facts showing that such holdings "were objectively false" and subjectively disbelieved at the time they were made required dismissal).  Plaintiffs therefore cannot resurrect that claim in their Proposed SCAC.  *See* Opp. to Recons. Motion at 13 & n. 9.  Indeed, Plaintiffs' attempted distinction  is illusory and has no connection to RBS's actual disclosures to investors, as RBS previously demonstrated.  *See, e.g.*, Opp. to Recons. Mot. at 13.

---

[8]    Plaintiffs have described their so-called "valuation" claims as challenging the bank's "valuation of its [credit market] holdings (i.e., the percentage by which RBS was writing down the holdings on its books)."  Reconsideration Motion at 1.  The Proposed SCAC challenges just such "valuations."  *See, e.g.*, ¶ 64-65 (alleging that "RBS drastically understated the extent of credit market write-downs (i.e., losses) it had incurred during 2007" and directly challenging RBS's "market marks" in February 2008); *see also, e.g.*, ¶ 81.

In any event, nothing in the Proposed SCAC adds anything to Plaintiffs' so-called "exposure" claims.  Plaintiffs repeat over and over again, as they have before, that RBS must have falsely represented its "exposures" in its December 6, 2007 Trading Statement because RBS supposedly disclosed larger revised "exposures in Appendix 2 to its year-end 2008 financial results, issued on February 26, 2009."  Proposed SCAC ¶ 58, *see also, e.g.*, *id.* ¶¶ 48, 63.  But the CAC also relied on the same Appendix 2 to allege that RBS's earlier statements from December 2007 regarding its credit market exposures must have been knowingly false.  *Compare* Proposed SCAC ¶ 48 (alleging that Appendix 2 shows that RBS understated the value of its credit market assets in December 2007), *with* CAC ¶ 277 (alleging that Appendix 2 shows that "defendants materially understated its subprime and other credit market exposure"), *and* Pls.' Opp. to Mot. to Dismiss at 9-10 (same).  Plaintiffs also presented the issue at length at oral argument.  The Court considered these same allegations and rejected them as insufficient when it dismissed the CAC. *See* Order at 16 (holding that CAC's allegations fail to plead a claim that RBS misstated its credit market assets).

The Court's dismissal was correct.  As Defendants have already shown, Plaintiffs' reliance on subsequent disclosures in the form of Appendix 2 is impermissible hindsight pleading that fails as a matter of law to show that any of RBS's earlier disclosures were knowingly or recklessly false when they were made.  *See, e.g.*, Defs.' Reply in Support of MTD at 22-23; *see also* Opp. to Recons. Mot. at 13-14.  In addition, although the Court need not plunge such depths, the numbers disclosed in Appendix 2 are entirely consistent with those in the December 6, 2007 Trading Statement, and RBS never "revised" its 2007 numbers.  Plaintiffs simply misread the documents.

Briefly, in the December 6, 2007 Trading Statement, RBS disclosed the following exposures, net of hedges, as of November 30, 2007:

*Exposure net of hedges and write-downs at 30 November*

|  | £m |
|---|---|
| Super senior tranches of ABS CDOs | |
| High grade CDOs | 1,100 |
| Mezzanine CDOs | 1,256 |
| CDO squared | 0 |
| Sub-prime trading inventory | |
| Investment grade | 717 |
| Non-investment grade | 218 |
| Residuals | 86 |

December 6, 2007 Trading Statement.[9]  In addition, in the same document RBS separately disclosed exposures for ABN AMRO, recently acquired by a consortium in which RBS was a participant:

*Exposure net of hedges and write-downs at 30 November*

|  | £m |
|---|---|
| Super senior tranches of ABS CDOs | |
| High grade CDOs | 1,667 |
| Mezzanine CDOs | 0 |
| CDO squared | 0 |
| Sub-prime trading inventory | 51 |
| Residuals | 0 |

*Id.*  Adding these numbers together, the total net "exposure" for RBS and ABN combined as of November 30, 2007, was thus £5.095 billion.  And RBS made clear that all of the net exposure numbers were based on *estimates* of the fair value of the complex, illiquid securities at issue, as well as an assessment of the risk posed by monoline insurers (*i.e.*, hedges), and as such the numbers were not represented as "hard facts" as Plaintiffs have repeatedly distorted.  For example, RBS explained: "Our valuations of the ABS CDO super senior exposures take into

---

[9]        A*vailable at* http://www.investors.rbs.com/download/ announcements/PcTs061207.pdf.

consideration outputs from our proprietary model, market data and prudent valuation adjustments," and further that the ABN "results include write-downs on US sub-prime mortgage exposures (see Appendix) which have now been valued using the same approach as RBS." *Id.*

On February 28, 2008, RBS published its 2007 Annual Report, which included net exposures as of December 31, 2007, now for the combined RBS and ABN entities. Those numbers were:

**Group (including ABN AMRO)**
Net exposure at 31 December 2007 Average price

| | £m |
|---|---|
| Super senior tranches of ABS CDOs | |
| High grade CDOs | 2,581 |
| Mezzanine CDOs | 1,253 |
| CDO squared | - - |
| Sub-prime trading inventory | |
| Investment grade | 937 |
| Non-investment grade | 255 |
| Residuals | 100 |
| Leveraged finance | 8,698 |

2007 RBS Annual Report at 58.[10]

Accordingly, the total net exposure disclosed as of December 31, 2007 was £5.126 billion, plus £8.698 billion for Leveraged Finance, with the minor increase above the December 6, 2007 Trading Statement numbers (£0.031 billion) consistent with the fact that the Trading Statement was as-of November 30, 2007, whereas the Annual Report was as-of December 31, 2007. *See also* Proposed SCAC ¶ 48 (acknowledging "$0.4 billion of losses on Super Senior CDO exposures that RBS recorded between December 6, 2007 and December 31, 2007"). And as RBS had in the Trading Statement, in the 2008 Annual Report (at 57) it again made clear that the net exposure numbers concerning complex, illiquid securities, were matters of judgment: "Our valuations of the ABS CDO super senior exposures take into consideration outputs from our proprietary model, observable market benchmarks and prudent valuation adjustments."

---

[10]     A*vailable at* http://www.investors.rbs.com/download/ announcements/FYR07.pdf.

The Proposed SCAC contends, as Plaintiffs have repeatedly before, that Appendix 2 to RBS's 2008 Annual Report, which was published on February 28, 2009, supposedly "restated" its earlier numbers from the 2007 Annual Report, but that is simply incorrect as shown on the face of the documents.   An apples-to-apples comparison of the net exposures disclosed in Appendix 2 for December 31, 2007 are the same as those from the 2007 Annual Report.   For example, Appendix 2, like the 2007 Annual Report, disclosed £2.581 billion High Grade CDOs, and £1.253 billion Mezzanine CDOs.  *Compare* 2007 Annual Report at 57, *with* Appendix 2 at 8, 9;[11] *see also* 2008 Annual Report at 47 (reporting £2.582 in High Grade CDO exposure as of year-end 2007).[12]   Similarly, RBS's Subprime Trading Inventory, which was disclosed at a total of £1.292 billion in the 2007 Annual Report, was disclosed at exactly the same amount in the 2008 Annual Report.  *Compare* 2008 Annual Report at 47 (disclosing £1.292 billion subprime U.S. residential mortgages as of December 31, 2007), *with* 2007 Annual Report at 57 (disclosing £937 billion and £255 billion, or £1.292 billion, in subprime trading inventory as of December 31, 2007).   And RBS's 2007 Annual Report (at 58) discloses £1,386 in exposure to CLOs as of December 31, 2007, which is the exact same CLO exposure that RBS reported for year-end 2007 in its 2008 Annual Report (at 47).

It is difficult to figure out where Plaintiffs' alternative numbers come from, because they convert their figures to dollars and do not appropriately source them, persisting in trying "to obfuscate the nature of RBS's holdings" by "lumping all 'subprime and other credit market assets' into the same category."   Order at 15.  But what is plain is that the Proposed SCAC

---

[11]      *Available at* http://www.investors.rbs.com/download/corporate_actions/capital_restructuring/ 2008_Annual_Results_26_ February_2009_Appendix_2.pdf

[12]      *Available at* http://www.investors.rbs.com/download/announcements/2008_Annual_Results_26 _February_09_Announcement.pdf.

attempts to distort the numbers by making apples-to-oranges comparisons, for example, apparently comparing earlier disclosures *minus* Leveraged Finance or CLOs with later disclosures that include those amounts.  The overarching, dispositive point, is that—contrary to Plaintiffs' repeated assertion—RBS never "restated" its December 31, 2007 or December 6, 2007 exposure numbers,[13] and hence the Proposed SCAC cannot state a claim for a material misstatement, much less that RBS or any individual *knowingly or recklessly* misstated anything having to do with RBS's exposure to CDOs and other complex, illiquid securities or associated hedges.  The Court previously so held in dismissing the CAC, and the Proposed SCAC adds nothing new.

### C.     The Proposed SCAC Does Not Allege Any Other Material Misstatements Against RBS, Goodwin, Cameron, Or McKillop

Plaintiffs' remaining proposed "new" allegations fall into the same three general categories of claims that were brought in the CAC, and they fail for the same reasons.

*First*, Plaintiffs allege that Defendants made statements that supposedly misrepresented the extent of RBS's "CDOs and other credit market holdings" starting in August 2007, prior to its publication of the Trading Statement in December 2007.  *See, e.g.*, SCAC ¶¶ 8, 32-33, 36(i),

---

[13]     The 2008 Annual Report, which included Appendix 2, stated that RBS was making only the following restatements:

> Divisional results for 2007 have been restated to reflect the new organisational structure announced in February 2008. These changes do not affect the Group's results.

> The statutory income statement and cash flow statement for the year ended 31 December 2007 have been restated to reflect the reclassification of Banco Real as a discontinued operation.

> The pro forma and statutory balance sheets as at 31 December 2007 have been restated to reflect the finalization of the purchase accounting adjustments in respect of ABN AMRO and the netting of certain derivative contracts.

*See* 2008 Annual Report, at 4, 95.

45, 50, 55.  For example, the Proposed SCAC alleges that Mssrs. Cameron and McKillop's August 2007 description of the bank's exposure to the subprime lending crisis as indirect was false because RBS was allegedly "retaining billions of dollars of [] subprime **loans** in the form of the **super senior tranches**."  ¶ 33 (emphasis added)).  But McKillop's statement is clear on its face that the bank's exposure was indirect because RBS was not "operating in that direct space" (*i.e.*, it did not directly originate subprime loans).  *Id.*  Thus, as in the CAC (*e.g.* ¶¶ 91, 158-179), Plaintiffs impermissibly conflate RBS's retention of super senior CDOs and other securitized assets with statements regarding the bank's "direct" exposure to "subprime" loans, a pleading tactic that has already been rejected by the Court.  *See* Order at 4-5, 15 & n.8, 19 ("Plaintiffs omit that when RBS said it 'did not do subprime,' it was talking about direct origination of subprime loans . . . [and] was not discussing its credit portfolio of over a trillion dollars").  Indeed, the Court previously criticized Plaintiffs for such "obfuscat[ion of] the nature of RBS's holdings" in the CAC, and expressly recognized that it was conceivable in 2007 that the sort of super-senior CDO interests RBS held could avoid losses regardless of whether there were defaults on the underlying loans.  *Id.* at 15 n.8.  Moreover, most of these statements are *per se* inactionable for the independent reason that they were made months before the first issuance of the ADR shares in October 2007.  *See, e.g.*, Defs.' Mem. in Supp. of Motion to Dismiss  at 54 (explaining that such statements do not meet the '34 Act's "in connection with" requirement).

**Second**, the Proposed SCAC challenges statements regarding the April 2008 Rights Issue.  For example, it alleges that Mr. Goodwin told the market on February 28, 2008, that "[t]here are no plans for any inorganic capital raisings or anything of the sort" and that this must have been false because the bank then raised capital in the Rights Issue on April 22.  Proposed SCAC ¶¶ 72, 107.  These and other allegations about the Rights Issue in the Proposed SCAC are

the same as the ones from the CAC.  *Compare* Proposed SCAC ¶¶ 72, 74, 89 *with* CAC ¶¶ 149, 203.  The deficiencies of these allegations have already been extensively addressed, and the Court correctly rejected them when it dismissed the CAC.  *See* Defs.' Mem. in Support of Mot. to Dismiss at 27; Defs.' Reply in Supp. Of Motion to Dismiss at 34-35; Order at 6-7.  The alleged misstatements are plainly inactionable, forward-looking matters of opinion that cannot state a claim, and the Proposed SCAC relies entirely on impermissible hindsight pleading.

*Third*, as in the CAC, Plaintiffs also challenge statements regarding the success of RBS's integration of ABN AMRO—for example, that the "[i]ntegration of RBS is progressing well" or that the "integration of ABN AMRO is off to a promising start"—that the Court has already determined are inactionable for multiple reasons.  *See* Order at 13-14 (holding that such statements were "merely vague pronouncements of corporate optimism," and characterizing the CAC's integration allegations as "conclusory" and "based largely on hindsight").  The Proposed SCAC merely repeats these pleading errors.  *Compare* Proposed SCAC ¶¶ 78, 84, 89, *with* CAC ¶¶ 184, 199, 205.

### D.   The Proposed SCAC Cannot Plead Scienter By Relying On Material From The FSA Report

Finally, Plaintiffs also represented in the Reconsideration Motion that they could support their scienter allegations based on "new" information in the FSA Report, but they do not.  The "new" information in the Proposed Complaint is the same material that the parties have briefed extensively.  *See* Opp. to Recons. Mot. at 11-13 & ns. 6-7.  The Court was well aware of the FSA's conclusions when it dismissed the CAC with prejudice.  Indeed, as Defendants have shown, and as was fully vetted at oral argument, the facts and conclusions in the FSA Report decisively refute any inference of scienter.  *See, e.g.*, RBS Mem. in Supp. of Mot. to Dismiss at 26-28, 57-58, 61, 66; RBS Reply in Supp. of Mot. to Dismiss at 3, 24-25.

None of the selective quotations from the FSA Report contained in the Proposed SCAC, taken separately or together, suggests any knowing or reckless misconduct by RBS or any of the individual defendants—much less provide the requisite strong inference of scienter—as opposed to a good-faith but ill-fated effort to assess the risk to the bank and apprise shareholders of that assessment in the face of a rapidly deteriorating market.  Pointedly, and contrary to Plaintiffs' protestations, the FSA did investigate RBS's and the individuals' conduct and statements, and concluded that "decisions [including during the proposed class period] were not the result of a lack of integrity by any individual" and that there were no "instances of fraud or dishonest activity by RBS senior individuals" or even "a failure of governance on the part of the Board." FSA Report at 354 (quoted previously in Defs. Reply in Support of Mot. to Dismiss at 23). Plaintiffs ask the Court to ignore the FSA's overall conclusions entirely, but all of the facts and findings discussed in the FSA Report—including the ones selectively quoted in the Proposed SCAC—form the basis for the FSA's conclusions, and those facts likewise refute any inference of scienter as to the matters Plaintiffs allege.

For example, as to supposed misstatements about CDOs and other credit market exposures, the Proposed SCAC cites the FSA Report for such propositions as "GBM was the investment bank division of RBS, and thus it was responsible for all of RBS's subprime and other credit market holdings," that in 2006 "the growth plan required GBM to increase its CDO activity by at least 50% and increase its presence in the U.S. leveraged finance market," and that in 2007 RBS, "like other firms, accumulated significant holdings of super senior [CDO] tranches because . . . there proved to be inadequate demand for the super senior tranches."  Proposed SCAC ¶ 36.  None of this has anything to do with whether Defendants knowingly or recklessly misrepresented the bank's perceived risk or exposure to "subprime" during that period.  On the

contrary, the FSA Report found that RBS's assessment of its CDO interests was, on the basis of the information then available, consistent with that of "many market participants [who] assumed (and were reassured by credit ratings) that the senior and super senior tranches of CDOs could remain high quality even if the underlying credits were turning bad," FSA Report at 51, and which in any event was immaterial at the time because it "represented only 0.4% and 0.3% of GBM's balance sheet at the end of 2006 and 2007 respectively," *id.* at 403.  Judge Batts agreed when she dismissed the preferred share claims.  *See In re Royal Bank of Scotland Group plc Sec. Litig.*,  2012 WL 3826261, 9 (S.D.N.Y. Sept. 4, 2012).  The FSA Report (at 45) also observed that RBS's securitization activities were "clear to the markets."[14]

As to Defendants' later disclosures in December 2007 and February 2008 about "exposures" and "valuations," there is again nothing in the FSA Report to support an inference of scienter.  The Proposed SCAC cites the FSA Report to try to establish, for example, that "RBS's monitoring of these exposures increased as the market turmoil intensified in 2007 and its exposures grew," and that "[f]rom August 2007 the RBS Board received reports of the super senior positions retained on the balance sheet.  It discussed market turmoil on 24 August 2007 and again on 16 September 2007."  *Id.* ¶ 52.  But again, this and the other material quoted from the FSA Report has nothing to say about whether Defendants misrepresented anything to the markets in December 2007 or February 2008 about its "exposures" and "valuations" related to CDOs and other credit market holdings, much less knowingly or recklessly, as the Proposed SCAC attempts to plead.  The FSA Report discussed RBS's disclosures about its credit market

---

[14]     The FSA Report flatly refutes any inference that Mr. Cameron's statement that RBS had "cut back a lot since the year end of '06" was false.  *See* SCAC ¶ 32, 36(i); Def. Reply In Supp. Of Mot. to Dismiss at  24 n. 22 (citing FSA Rpt. at 147 (noting that in spring 2007 RBS "halted its new origination of structured credit"); *id.* at 370-71 & Tables 3.4, 3.5 (showing decline in ABS and CDO issuance from 2006 to 2007)).  Plaintiffs made these exact same allegations in the CAC (*e.g.*, ¶ 91), and the Court found them insufficient to state a claim.

exposures and losses in detail, even portraying them in its own tables, and did not identify any fault in them. *See, e.g.*, FSA Report at 362-64. The FSA Report similarly did not find that any disclosures about the "exposures" had ever been restated. And the FSA Report explained that "no evidence was identified that the valuations adopted were outside the limits of what was plausible, the decisions made could not be said to be unreasonable and therefore could not be subject to enforcement action." *Id.* at 405.

The FSA Report similarly refutes any inference of scienter concerning statements made about the Rights Issue. The Proposed SCAC states that "on April 9, 2008, FSA CEO Sants met with defendant Goodwin. During that meeting, Sants 'specifically required [Goodwin] to have a rights issue. . . .'" Proposed SCAC ¶ 75. The Proposed SCAC further cites the FSA Report to establish "increasing influence the FSA was exerting on RBS's Operations" leading up to the Rights Issue. *Id.* ¶ 76. None of this has anything to do with whether there were any misstatements in *February 2008* about Defendants' intentions to have the Rights Issue, as the Proposed SCAC alleges (at ¶ 72), or that Defendants knew that there would be a need for subsequent capital later as the market further imploded. On the contrary, following its extensive investigation, the FSA concluded that "it appeared at the time that the rights issue announced in April 2008 had placed RBS in a strong capital position," and that only "with hindsight" did it become clear that RBS was too thinly capitalized to survive the crisis. FSA Report at 25-26.

Finally, as to the ABN acquisition, the Proposed SCAC cites the FSA Report for the unremarkable propositions that "[t]he ABN AMRO acquisition was not only the largest in RBS's history, it was the largest in the history of banking"; that in December 2007 "RBS was well aware that ABN AMRO had exposures to [CDOs]"; and that "by February 28, 2008, RBS was operating under increasing FSA scrutiny." Proposed SCAC ¶¶ 79, 82, 88. Such information has

no bearing on whether Defendants made any knowingly or recklessly false statement about ABN's exposures or the success of the ongoing integration of RBS and ABN in December 2007 or later.  And the FSA Report identifies no such misstatements about ABN.

In sum, none of the "new" information from the FSA Report lends anything to Plaintiffs' scienter allegations, which have been correctly rejected by the Court already.

## CONCLUSION

For the reasons set forth above and in RBS's Opposition to Plaintiffs' Reconsideration Motion, Plaintiffs' Reconsideration Motion and Motion to Alter Judgment should be denied.

Dated:  November 13, 2012                          Respectfully submitted,


                                                   /s/ David S. Lesser
                                                   David S. Lesser
                                                   Robert W. Trenchard
                                                   WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP
                                                   399 Park Avenue
                                                   New York, New York 10022
                                                   Telephone:  212-230-8800
                                                   Fax:  212-230-8888

                                                   Andrea J. Robinson
                                                   WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP
                                                   60 State Street
                                                   Boston, Massachusetts 02109
                                                   Telephone:  617-526-6000
                                                   Fax:  617-526-5000

                                                   *Counsel for The Royal Bank of Scotland plc*