UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
LIGHTHOUSE FINANCIAL GROUP, : Civil Action No. 1:11-cv-00398-GBD
Individually and on Behalf of All Others :
Similarly Situated, : <u>CLASS ACTION</u>
:
Plaintiff, :
:
vs. :
:
THE ROYAL BANK OF SCOTLAND :
GROUP, PLC, et al., :
:
Defendants. :
—————————————————————— 
ETHAN GOLD, Individually and on Behalf of : Civil Action No. 1:11-cv-01162-NRB
All Others Similarly Situated, :
: <u>CLASS ACTION</u>
Plaintiff, :
:
vs. :
:
THE ROYAL BANK OF SCOTLAND :
GROUP, PLC, et al., :
:
Defendants. :
—————————————————————— x

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   ARGUMENT ...........................................................................................................1

      A.    Plaintiffs Were Not Required to File a Formal Motion for Leave..........................1

      B.    Plaintiffs' Amended 1934 Act Claims Are Timely ..............................................3

      C.    The Amended Complaint Is Not Futile.................................................................4

            1.    August 3, 2007 ..........................................................................................5

            2.    December 6, 2007 Trading Update .............................................................6

                  a.    "U.S. Subprime Exposures"..........................................................6

                  b.    Goodwin's False Assurance ..........................................................7

            3.    2007 Annual Report – February 28, 2008 ..................................................7

                  a.    Understated CDO and U.S. Subprime RMBS Holdings.................7

                  b.    Understated CLO Holdings............................................................9

                  c.    Understated Leveraged Finance Exposure.....................................9

                  d.    Understated Exposure to Monoline Insurers...................................9

                  e.    Understated Credit-Market Write-Downs.......................................9

            4.    Concealing Brink of Government Takeover...............................................10

            5.    ABN AMRO .............................................................................................10

790556_1

## I.      PRELIMINARY STATEMENT

In theory, all litigation is supposed to be a search for the truth.  Throughout their opposition to plaintiffs' motion for relief from judgment, however, defendants display not just a lack of interest in the truth, but genuine contempt for it.  That can be seen in their analysis of cases, which they repeatedly misconstrue.  In their descriptions of the record and plaintiffs' amended allegations, which they repeatedly mischaracterize.  And most glaringly in regard to their own conduct, which above all else, defendants want to avoid coming to light.  That is the irony here.  Despite their bravado, what defendants fear most is having this case decided on its merits.  That is all plaintiffs want:  the opportunity to stand behind and prove the merits of their case.  Plaintiffs respectfully submit that they have done more than enough to earn that opportunity.

## II.     ARGUMENT

### A.      Plaintiffs Were Not Required to File a Formal Motion for Leave

Fifteen days after unequivocally insisting that the Court "deliberately ***denied***" plaintiffs' request for leave to amend (Dkt. No. 161 at 7) (emphasis in original), defendants now declare that it "makes no difference" if the Court overlooked plaintiffs' multiple requests for leave to amend because "informal requests are no substitute for an actual motion seeking leave to replead pursuant to Rule 15."  Dkt. No. 163 at 4.  Even after reversing course, defendants still point the Court in the wrong direction.  Just last year, the Second Circuit condemned the very path defendants urge the Court to take, holding that it is "unmistakably clear" that there is no rule requiring plaintiffs to request leave to amend before or while a motion to dismiss is pending, and that it is "not a proper exercise of the district court's discretion" to deny a post-judgment request for leave simply because it was not brought earlier.  *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011).  As a result, the Second Circuit vacated the District Court's order denying the post-judgment motion for leave to

amend and remanded for a determination only as to "whether the proposed amendments would be futile." *Id.* at 214-15. Nevertheless, defendants dedicate over 25% of their opposition to the argument that this Court should deny plaintiffs' motions for relief from judgment and reconsideration ***without considering the adequacy of plaintiffs' proposed amendments***. *See* Dkt. No. 163 at 3-8.

Predictably, after dozens of pages of opposition briefs, defendants have yet to unearth a single case in which a court did what defendants demand, let alone any that have done so since *Williams*. In fact, defendants cite only one post-*Williams* case, *In re UBS AG ERISA Litig.*, No. 08 Civ. 6696 (RJS), 2012 WL 1034445 (S.D.N.Y. Mar. 23, 2012). *See* Dkt. No. 163 at 4. Yet, that case expressly held that "even if Plaintiffs' motion were timely and properly made, it would still be futile." *UBS*, 2012 WL 1034445, at *7. In other words, any language that conflicted with *Williams* would have been dictum in light of the court's futility determination. The additional cases defendants cite predate *Williams*, but still do not support defendants' argument because in each one, the Court analyzed the proposed amended allegations. *See* Dkt. No. 163 at 4-8 (citing *In re Gildan Activewear, Inc. Sec. Litig.*, No. 08 Civ. 5048 (HB), 2009 WL 4544287, at *5 (S.D.N.Y. Dec. 4, 2009) (finding futility in that "it seems likely from the record that such a motion [for leave to amend] would be doomed to failure");[1] *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007

---

[1]   *Gildan* is a doubly inappropriate case for defendants to cite in purported support of their argument because there, unlike here,

> Pursuant to this Court's individual practices, upon service of a motion to dismiss, every plaintiff has the opportunity to amend the complaint as of right. Thus, each plaintiff has the opportunity, having had the benefit of learning from the motion to dismiss what the potential deficiencies of the complaint might be, and to attempt to cure those deficiencies in an amended complaint. However, the rules make explicit that this will be the plaintiff's one and only opportunity to amend, and that if the plaintiff's choice is to fight the motion to dismiss and not amend the complaint, if the motion is granted, it will be with prejudice.

WL 2589482, at *4 (S.D.N.Y. Sept. 7, 2007) (plaintiffs' request deemed futile due to failure to provide any indication as to what plaintiffs would add to make complaint viable); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 221 (2d Cir. 2006) (finding proposed amendments would be futile); *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 409 (S.D.N.Y. 2009) (same); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (proposed amendments merely recycled versions of dismissed claims)).

Defendants also cite *McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992) and *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2008 WL 4962985 (S.D.N.Y. Nov. 20, 2008).  *See* Dkt. No. 163 at 5, 7.  Yet, in *McLaughlin*, the Second Circuit expressly held that, "[o]f course, the lack of a formal motion is not sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear."  962 F.2d at 195.  In fact, the court ruled against the plaintiffs for ***not*** doing what plaintiffs here ***are*** doing.  *Id.* ("Given the specific and detailed direction provided to the plaintiffs ***and the plaintiffs' failure to file either a motion to amend or a motion to reconsider***, we find no abuse of discretion in the district court's failure to grant leave to amend.") (emphasis added).  And in *Refco*, the court ***granted*** reconsideration and denied the request for leave only after making a futility determination.  2008 WL 4962985, at *5.

### B.    Plaintiffs' Amended 1934 Act Claims Are Timely

Defendants' next stab at avoiding any substantive consideration of plaintiffs' proposed amended complaint is to ask the Court to deem the complaint barred by the statute of limitations.  Defendants contend that "Plaintiffs were on notice of their claims no later than December 2007."

---

*Gildan*, 2009 WL 4544287, at *1.  Defendants cited *Gildan* and asked the Court to rely on it in ***two different briefs***, but withheld the *Gildan* court's practices, which clearly distinguish that case.

*See* Dkt. No. 163 at 10.  Even if one ignores the absurdity of this assertion in the face of claims

based on false statements that were not even made until February 28, 2008 (¶¶58-71, 84-92[2]) and

April 22, 2008 (¶¶72-77), all it does is confirm precisely what plaintiffs contended in their motion

for reconsideration:  "defendants must concede that the ***only*** way plaintiffs' 1934 Act claims are

untimely is if the '*American Pipe* tolling rule has no application to the [19]34 Act claims.'"  *See* Dkt.

No. 157 at 10-11 (quoting Dkt. No. 86 at 34) (emphasis in original); *see also* Dkt. No. 163 at 11.  If

the *American Pipe* tolling rule ***does*** apply to cases in which the lead plaintiffs are ultimately

determined to lack standing (and it should[3]), then plaintiffs' 1934 Act claims would be timely even

using the irrational December 2007 accrual date.  The two-year limitations period would have been

tolled from at least July 15, 2009 through January 11, 2011.  ¶16.  As of January 11, 2011, therefore,

at least four-and-a-half months remained in the 24-months' limitations period.  Plaintiffs filed their

1934 Act claims 17 days later, on January 28, 2011.  *Id.*

It is apparent, then, that defendants cannot prevail on this affirmative defense absent a

finding that *American Pipe* does ***not*** apply here.  Rather than acknowledge that the Court expressly

declined to address the applicability of *American Pipe* (*see* Dkt. No. 154 at 25 n.14), defendants ask

the Court to deny plaintiffs' motions based on the statute of limitations.  In doing so, defendants

again attempt to lead the Court down the path of clear error.

### C.   The Amended Complaint Is Not Futile

Once defendants purport to address the actual substance of the proposed amended complaint,

it is clear why they hope to steer the Court away from considering the amended allegations.

Defendants simply have no answer for them.  Plaintiffs' proposed amended complaint sets forth 14

---

[2]   Unless otherwise indicated, all "¶" references refer to plaintiffs' proposed second consolidated amended complaint, which is attached as Exhibit 1.

[3]   *See* Dkt. No. 96 at 37-38.

790556_1

discrete objectively false statements. *See* ¶¶32(a), (b), (c), 33, 47, 50, 60, 61 (two false statements), 62, 64, 74, 78, 84. Defendants do not challenge the sufficiency of most of their false statements,[4] and they attack allegations plaintiffs do not raise.[5]

### 1.     August 3, 2007

By failing to even attempt to refute them, defendants concede the sufficiency of defendant Cameron's three false statements, which are set forth in ¶32(a), (b) and (c). Defendants also offer no challenge to the abundant evidence of Cameron's scienter set forth in ¶¶35 and 36(a)-(j).

Regarding the August 2007 false statements of defendants Goodwin and McKillop about RBS's subprime-related activities, defendants address only McKillop's statement. *See* Dkt. No. 163 at 18. But Goodwin's statement provided the context for McKillop's, and that context directly contradicts defendants' argument. Defendants represent that when McKillop offered his assurance that RBS had not been, and would not be, "very adversely affected by the subprime situation" (¶33), he meant simply that RBS "did not directly originate subprime loans." *See* Dkt. No. 163 at 18. But Goodwin's immediately preceding statement makes clear that he and McKillop were talking about RBS's subprime *securitization* activities, not its loan *origination* activities:

---

[4]       Even if defendants did contest the falsity of the specific statements plaintiffs identified, that is an issue for the trier of fact. *See, e.g.*, *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011). Moreover, though plaintiffs allege the falsity of these statements and the evidence of defendants' scienter one by one, or piece by piece, the question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that [strong inference] standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 318, 322-23 (2007) (emphasis in original). Similarly, "materiality issues are rarely appropriate for resolution on a motion to dismiss." *In re Regeneron Pharmaceuticals, Inc. Sec. Litig.*, No. 03 Civ. 3111 RWS, 2005 WL 225288, at *20 (S.D.N.Y. Feb. 1, 2005) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 (1988)).

[5]       *See, e.g.*, Dkt. No. 163 at 22 (contrary to defendants' argument, plaintiffs do *not* allege falsity as to either RBS's "valuations" or Goodwin's statement about no plans for inorganic capital raising).

We have a business in the United States that's involved in the packaging of those [subprime] debts through and for sale on to investors, so we see what's happening, it's affecting the market in which we operate, ***but it's not impacting us in that, in the direct way which it's impacting on some others***.

¶33.  More importantly, the essence of plaintiffs' allegations does not depend on the literal truth or falsity of defendants' words, but rather on the overall misleading ***impression*** they created.[6]  ¶34.

## 2.   December 6, 2007 Trading Update

Defendants also purport to refute the falsity of their December 6, 2007 trading update.  *See* Dkt. No. 163 at 14-17.  Once again, defendants refute only a portion of plaintiffs' allegations.

### a.   "U.S. Subprime Exposures"

With its December 6, 2007 Trading Update, RBS represented that it was disclosing its "U.S. Subprime Exposures."  ¶46.  "**Appendix:  US sub-prime exposures**" is the title of the one-page appendix that is the subject of this allegation.   Yet, despite three-and-a-half ***pages*** of briefing dedicated to defending this trading update, defendants fail to even acknowledge this title or what it means: RBS's trading update purported to educate investors as to RBS's U.S. subprime credit-market holdings.  Instead, RBS misled investors by understating its actual holdings.  ¶¶47-48.

In RBS's trading update, defendants revealed £4 billion ($8 billion) in "super senior" CDOs, (split between "high grade" and "mezzanine"), and another £1 billion ($2 billion) in "trading inventory of mortgage-backed securities and CDOs."  *See* ¶46.  Defendants represented that was the extent of RBS's "U.S. Sub-Prime Exposures."  Although the figure for net super senior CDOs was technically accurate, defendants do not deny their omission from the trading update of £7.2 billion

---

[6]     *See, e.g.*,  *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, No. 10 Civ. 7498 (LTS) (JCF), 2012 WL 1080366, at *16 (S.D.N.Y. Mar. 30, 2012) ("The Second Circuit recently re-affirmed that 'half-truths' – statements that are 'literally true' but 'create a materially misleading impression' – may support a securities claim."  (citing *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011)).

($14.4 billion) of CDO and U.S. Subprime RMBS holdings that were covered by failing monoline insurers (¶49), which omission rendered misleading even this literally true information.  More importantly, RBS actually had on its balance sheet at that time an additional £1.57 billion ($3.14 billion) of "Other CDOs" and £2.95 billion ($5.90 billion) in U.S. Subprime RMBS "Held-for-trading," which RBS failed to disclose until February 2009.  ¶48 (citing Appendix 2 to the 2008 Annual Report at 8 (for the "Other CDOs") and at 6 (for the U.S. Subprime RMBS) (attached as Exhibit 2).[7]  In response, defendants provide no defense of the £1 billion ($2 billion) figure for "trading inventory of mortgage-backed securities and CDOs," which understated RBS's actual holdings by 75%.

### b.    Goodwin's False Assurance

Also in connection with the December 6, 2007 trading update, defendants do not even attempt to refute the falsity and sufficiency of defendant Goodwin's related assurance that RBS had managed to avoid being saddled with more credit market holdings, despite having been so active packaging them for sale, because "we were never holding the stuff."  ¶50.

### 3.    2007 Annual Report – February 28, 2008

### a.    Understated CDO and U.S. Subprime RMBS Holdings

In RBS's 2007 Annual Report, defendants misrepresented that, as of December 31, 2007, RBS held £5 billion ($10 billion) of CDOs and U.S. Subprime RMBS, comprised of (i) £2.58 billion ($5.16 billion) in high-grade CDOs, (ii) £1.25 billion ($2.5 billion) in Mezzanine CDOs, (iii) £937 million ($1.87 billion) in investment grade subprime trading inventory RMBS and other CDOs, and (iv) £255 million ($.5 billion) in non-investment grade subprime trading inventory RMBS and

---

[7]    Notwithstanding defendants' feigned confusion over the math of the 1:2 pounds:dollars conversion rate plaintiffs applied to RBS's represented and actual holdings, the proposed amended complaint makes crystal clear where RBS revealed each category of its actual holdings.

CDOs.  ¶60 n.6 (citing 2007 Annual Report at 43).  In truth, as RBS admitted in 2009, RBS held £9.05 billion ($18.1 billion) of such assets as of December 31, 2007, comprised of (i) £3.834 billion ($7.7 billion) in super senior CDOs, (ii) £1.569 ($3.1 billion) in other CDOs, and (iii) £3.673 billion ($7.3 billion) in subprime RMBS.  ¶60 n.7 (citing Appendix 2 to 2008 Annual Report at 8 (CDOs) and at 6 (RMBS)).  Once again, RBS's technically accurate net super senior CDO figure gave a misleading impression due to the undisclosed billions of additional CDO holdings backed by failing monoline insurers, but the clearer misrepresentation was in defendants' gross understatement of RBS's "Other CDOs" and RMBS holdings.

Defendants do not attempt to reconcile the £1.569 ($3.1 billion) in "Other CDOs."  As for their subprime RMBS disclosure, defendants contend that "RBS's Subprime Trading Inventory, which was disclosed at £1,292 billion in the 2007 Annual Report, was disclosed at exactly the same amount in the 2008 Annual Report."  *See* Dkt. No. 163 at 16.  According to defendants, therefore, if one looked at RBS's 2008 Annual Report they would find a disclosure category for "Subprime Trading Inventory."  In truth, no such category exists.  The label for the £1.292 billion ($2.6 billion) figure defendants cite is "Held-for-trading portfolios only."  *See* Dkt. No. 163 at 16 (citing 2008 Annual Results, dated February 26, 2009, at 47 n.2 (excerpt attached as Exhibit 3)).  But the page from the 2008 Annual Results that defendants cite concludes with the statement, "Refer to Appendix 2 for further analysis and discussion."  *See* Exhibit 3.  Defendants' opposition omits this important disclaimer because Appendix 2 reveals that RBS's total net U.S. Subprime RMBS "Held-for-trading" was £2.953 billion ($5.9 billion).  *See* Exhibit 2 at 8.  Therefore, instead of £1.192 billion ($2.38 billion) in combined other CDOs and RMBS holdings, RBS really had £5.242 billion ($10.48 billion).

### b.      Understated CLO Holdings

Defendants pulled a similar trick in revising RBS's CLO holdings.  Although the number represented in 2007 (£1.386 billion ($2.77 billion)) was repeated in one portion of the 2008 Annual Report, in Appendix 2 to that report (and in the filed version of its 2008 Annual Report), RBS admitted that it had actually had £4.082 billion ($8.1 billion) net CLO holdings back in 2007.  *See* Exhibit 2 at 8 and the excerpt from the 2008 Annual Report attached as Exhibit 4.  Defendants' opposition withholds these admissions.

### c.      Understated Leveraged Finance Exposure

Defendants represented that the drawn portion of RBS's leveraged finance commitments was £8.7 billion ($17.4 billion), but they concealed RBS's leveraged finance commitments, which RBS was already writing down and meant RBS's leveraged finance exposure totaled £14.582 billion ($29.2 billion).  ¶61.  Defendants do not dispute falsity, materiality or scienter for these allegations.

### d.      Understated Exposure to Monoline Insurers

Regarding defendants' misrepresented £2.547 billion ($5.1 billion) figure for RBS's holdings backed by failing monoline insurers as of December 31, 2007, defendants do not refute that the true amount was £24.106 billion ($48.2 billion), as RBS revealed a year later.  ¶62.  Nor do they dispute materiality or scienter for these allegations.

### e.      Understated Credit-Market Write-Downs

Regarding defendants' false statements concerning RBS's credit market write-downs for 2007, defendants argue that plaintiffs' allegations concern the level of write-downs that RBS ***should have*** taken, *i.e.*, a valuation issue.  *See* Dkt. No. 163 at 12 n.8 (falsely asserting that the proposed amended complaint "directly challeng[es] RBS's 'market marks'").  That plainly mischaracterizes plaintiffs' allegations, which are not that RBS should have taken more write-downs in 2007.  Rather, plaintiffs allege that RBS ***actually took*** more write-downs than defendants revealed.  ¶64.

- 9 -

### 4.   Concealing Brink of Government Takeover

Regarding defendants Goodwin and McKillop's flagrantly false denials about whether the FSA had required, or even requested, that RBS raise money through the April 2008 Rights Offering (¶74), defendants offer no dispute as to their falsity, materiality, or scienter for these allegations.

### 5.   ABN AMRO

Similarly, defendants purport to challenge the adequacy of the allegations concerning defendants' false statements about ABN AMRO.  The December 6, 2007 false statements are set forth in ¶78 of the amended complaint, and the February 28, 2008 false statements are set forth in ¶¶84 and 85.  As is apparent, defendants address only part of Goodwin's December 6, 2007 statement, they simply fabricate another, and they do not even attempt to refute the falsity of any of the February 28, 2008 statements.  Dkt. No. 163 at 19.

Equally important, and telling, defendants do not even attempt to explain how or why these statements are not objectively false in the face of, *inter alia*, defendant McKillop's admission that "***no sooner had we acquired ABN Amro then the world changed dramatically and we were unable to implement that plan***" and other evidence uncovered by *The Sunday Telegraph*, including that, for defendant Cameron and GBM chief executive, Brian Crowe, "sitting in their adjoining offices, every day brought fresh horrors as staff reported back on what they were finding in the ABN books." ¶¶80, 81.  Once the Titanic started sinking, it would not have been a vague pronouncement of optimism to announce, "Her seaworthiness has been confirmed and she's rarely seemed safer than at this point."  It would have been a lie.  So too here, where ABN AMRO was RBS's iceberg.

DATED:  November 26, 2012

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
THEODORE J. PINTAR
JASON A. FORGE



s/ JASON A. FORGE
JASON A. FORGE

- 10 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 26, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 26, 2012.

s/ JASON A. FORGE
JASON A. FORGE

ROBBINS GELLER RUDMAN
&  DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  jforge@rgrdlaw.com

790556_1

# Mailing Information for a Case 1:11-cv-00398-GBD

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com
- **Charles H. Dufresne , Jr**
  cdufresne@sglawyers.com
- **Paul Adam Engelmayer**
  paul.engelmayer@wilmerhale.com
- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com
- **Shauna Kathleen Friedman**
  shauna.friedman@wilmerhale.com
- **D. Seamus Kaskela**
  skaskela@ktmc.com
- **Thomas Livezey Laughlin , IV**
  tlaughlin@scott-scott.com,efile@scott-scott.com
- **David Sapir Lesser**
  david.lesser@wilmer.com,lesserda@yahoo.com
- **James Stuart Notis**
  jnotis@gardylaw.com
- **Theodore J. Pintar**
  tedp@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Andrea J. Robinson**
  andrea.robinson@wilmerhale.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **David R. Scott**
  drscott@scott-scott.com,efile@scott-scott.com
- **Robert Walter Trenchard**
  robert.trenchard@wilmer.com
- **Curtis Victor Trinko**
  ctrinko@gmail.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Ethan Gold
,
```

**David M. Promisloff**
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087