

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LIGHTHOUSE FINANCIAL GROUP,    :
Individually, and on Behalf of All Others    :
Similarly Situated,    :
                            :
                    Plaintiffs,    :
                            :
        -against-                   :
                            :
                            :
THE ROYAL BANK OF SCOTLAND GROUP,    :
PLC, et al.,                    :
                            :
                    Defendants.    :
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM DECISION**
**AND ORDER**

11 Civ. 398 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiffs IBEW Local Union No. 58 Pension Trust Fund and Annuity Funds, City of

Taylor General Employees Retirement System, and Ute Mountain Ute Tribe brought this action

against The Royal Bank of Scotland Group, PLC, and several of its officers and directors for

violations of the securities laws. On September 28, 2012, this Court dismissed Plaintiffs'

Consolidated Amended Complaint ("CAC"), which alleged violations of both the Securities Act

of 1933 and the Securities Exchange Act of 1934, for failure to state a claim under Fed. R. Civ.

P. 12(b). *See Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp.*, 902 F. Supp. 2d 329 (S.D.N.Y.

2012) ("*Lighthouse I*"). After the dismissal, Plaintiffs moved for leave to amend. ECF Nos.

156, 159.[1]  Because Plaintiffs' proposed Second Consolidated Amended Complaint ("SCAC")

---

[1] Although Plaintiffs formally style their motions as ones for reconsideration (pursuant to Local Rule 6.3, ECF No. 156) and to alter or amend this Court's judgment (pursuant to Fed. Rs. Civ. P. 59(e) and 60(b), ECF No. 159), in substance, they both seek leave to file an amended complaint (pursuant to Fed. R. Civ. P. 15(a)), which will be addressed under that standard.

also fails to state a claim, granting leave to amend would be futile. Plaintiffs' motions are DENIED.

## Procedural History

RBS is a United Kingdom-based bank that was severely affected by the financial crisis of 2007-2009. According to Plaintiffs, its aggressive expansion in the years leading up to the financial crisis was fueled by reaching too far into the United States subprime residential housing market. SCAC ¶¶ 4-5. Its business repackaging and selling residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") provided a boost to profits at first, but then left the bank holding low quality assets that it could not sell when the market for these structured securities ceased to function in 2007. *Id.* This, along with its poorly-timed acquisition of Dutch bank ABN AMRO in the fall of 2007, led to a deterioration of its financial health, requiring the bank to raise additional capital in April 2008, and ultimately requiring a massive intervention by the U.K. government in 2009. *Id.* ¶ 8(h)-(i).

Plaintiffs, purchasers of RBS's American Depository Receipts ("ADRs"), filed their original complaint in this case on January 19, 2011, and their CAC on November 1, 2011. The CAC alleged that RBS and its officers and directors violated Sections 11, 12(a)(2), and 15 of the Securities Act, and Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act. Plaintiffs alleged that Defendants made false and misleading statements regarding RBS's exposure to subprime lending, its due diligence in connection with the purchase of ABN AMRO, and its April 2008 rights issue.

This Court dismissed the CAC for failure to state a claim on several grounds. The Exchange Act claims were dismissed because many of the misstatements alleged were not false

2

or material, and the CAC failed to raise the strong inference of scienter required. *Lighthouse I*, 902 F. Supp. 2d at 339-343. The Securities Act claims were dismissed for failure to plead actionable misstatements. *Id.* at 343-347. Both sets of claims were also dismissed on the independent ground of being untimely, Plaintiffs having failed to plead facts indicating compliance with the respective statutes of limitations. *Id.* at 346-348.

Plaintiffs moved for leave to file a more focused and slimmer version of their CAC. They claim that they can cure the deficiencies in the CAC by using facts gleaned from the report compiled by the U.K. Financial Services Authority on the failure of RBS. *See* FSA, The Failure of the Royal Bank of Scotland, December 2011, *available at* http://www.fsa.gov.uk/pubs/other/ rbs.pdf ("FSA Report"). This report came out a month after Plaintiffs filed their CAC and before Defendants filed their motions to dismiss, although Plaintiffs never sought leave to replead during that period.

The proposed SCAC repleads Exchange Act claims that touch on only three narrower categories of misstatements. It concedes all Securities Act claims and eliminates some of the individual defendants. Pls' Mem. of Law in Support of Reconsideration, ECF No. 157, at 2 (pledging to "streamline" its complaint by "dropping all 1933 Act claims, as well as claims against three of the five individual defendants . . ."). It also narrows the class period to those who purchased ADRs between October 17, 2007 (as opposed to March 7, 2007, as alleged in the CAC) and January 20, 2009. SCAC ¶ 2.

**The Proposed SCAC**

The ABN AMRO Acquisition Statements

The first category of alleged misstatements are those that RBS and individual defendant Frederick Goodwin (RBS's then-CEO) made regarding the ABN AMRO acquisition. On December 6, 2007, RBS put out a trading statement and press release that stated, *inter alia*, that its purchase of ABN AMRO was off to a "promising start," that RBS had "validated its plan" and that the acquisition seemed "more attractive and relevant." SCAC ¶ 78. This seven-page press release, which focused on RBS's financial health and earnings outlook, also contained cautionary language. It stated that its statements were based on current expectations that could change at any time, and that they were subject to a number of risks, including changing economic conditions and changes in the valuation of its investments.

The second set of alleged misstatements regarding the ABN AMRO acquisition came during RBS's 2007 earnings call on February 28, 2008. *Id.* ¶¶ 84-86. On the call, Goodwin stated that RBS's positive view of the ABN AMRO businesses was "confirmed," that the underlying performance of ABN AMRO was "in line with expectations," and that they were "happy" with what they bought. *Id.* ¶ 84. Plaintiffs allege that these statements masked the substantial losses that ABN AMRO had suffered, and would continue to suffer.

The Exposure Statements

The second category of misstatements concerns RBS's "CDO and Other Credit Market Holdings." SCAC at 12. Importantly, these claims only pertain to misrepresentations about the face value holdings (i.e. units) of structured products that RBS allegedly held during the class period. This Court dismissed Plaintiffs' claims based on how RBS valued these holdings on the

4

grounds that Plaintiffs did not plead any facts showing that RBS disbelieved its valuations at the time that they communicated them to the public. *Lighthouse I*, 902 F. Supp. 2d at 342-43. All Plaintiffs pleaded was that RBS did not write-down the value of its structured credit portfolio in line with certain market indices, but the CAC contained no facts that tied the securities that RBS actually held with the indices it cited. *Id.* In proposing its SCAC, Plaintiffs pledge to specifically "forgo such [valuation] claims," and only seek to state claims premised on misstatements regarding RBS's holdings. ECF No. 157 at 6; *see also* Pls' Reply Mem., ECF No. 162, at 9 (discussing the "valuation claims that plaintiffs expressly declined to pursue in an amended complaint.").

Plaintiffs claim that RBS materially misstated its structured credit holdings on three occasions. First, on August 3, 2007 (before any RBS ADRs traded on any U.S. exchange and two and a half months before the start of the class period), RBS held a conference call to discuss its interim financial results. SCAC ¶ 32. On that call, it stated that its structured credit portfolios had become more modest, that it had "hedges in all sorts of places," and that it had not taken any credit losses anywhere in its portfolio. *Id.* Plaintiffs allege that the FSA Report, issued in December 2011, reveals that in reality, RBS had significantly expanded its credit market holdings, that 95% of RBS's CDO exposure was unhedged, and that RBS had already incurred losses on its CDOs. *Id.* ¶ 33.

Second, Plaintiffs claim that the December 6, 2007 trading statement materially understated RBS's actual holdings. *Id.* ¶¶ 45-49. The appendix to the trading statement catalogued RBS's "US sub-prime exposures," listing £2.356 billion of super senior CDOs, £935 million of subprime RMBS trading inventory, and £86 million of residual securitizations. In reality, Plaintiffs claim that RBS held £3.834 billion in super senior CDOs, £1.569 billion of

5

other CDOs, and £2.953 billion in subprime RMBS. *Id.* ¶ 48. They claim that RBS mysteriously readjusted its holdings for year-end 2007 in its 2008 Annual Report without any explanation. Plaintiffs do not claim that the RBS's subprime valuations were inaccurate, just that the trading statement was incomplete because it did not disclose all of the subprime assets about which they, as investors, would have liked to know.[2]

Third, Plaintiffs contend that RBS's 2007 Annual Report, released on February 28, 2008, also understated RBS's net CDO and subprime RMBS holdings. Specifically, Plaintiffs claim that the 2007 Annual Report disclosed RBS as having £3.834 billion of super senior CDOs and £1.192 billion of subprime RMBS trading inventory. *Id.* ¶ 60, n.6. Plaintiffs point to the same corrective disclosure, the 2008 Annual Report, to demonstrate that these figures too were incorrect. *Id.* n.7. Plaintiffs also claim that RBS understated its exposure to leveraged finance, collateralized loan obligations, exposure to monoline insurers, and gross CDO holdings. *Id.* ¶¶ 61-63. Plaintiffs, however, do not contend that RBS should have restated its 2007 financials (which it never did) or that its auditor's clean opinion letter was false and misleading (its auditor is not, and never has been, a defendant in this action).

The Rights Issue Statements

The final alleged misstatement occurred on April 22, 2008. On that date, RBS announced that it was going to raise capital through a rights issue. RBS steadfastly denied that any of its regulators had required it to raise capital, insisting that "this is purely the Board of RBS decision, we were not asked to raise capital by anyone so we have to be very, very clear

---

[2] Comparison of Plaintiff's numbers to the actual reports, which use Pounds Sterling, is cumbersome because Plaintiffs report these figures in U.S. Dollars, without disclosing the exchange rate used. For ease of comparison, this opinion describes those figures in Pounds.

about that." SCAC ¶ 74. Plaintiffs contend that this statement was an outright lie, because

Hector Sants, the former CEO of the FSA (one of RBS's regulators) testified to a U.K.

Parliament committee that he "specifically required [RBS] to have a rights issue," and that the

FSA "required them to raise as much capital as possible." *Id.* Sants's testimony did not come

until January 30, 2012, several years after the alleged misstatement, and Plaintiffs do not claim

that the information in his testimony was made known to the market at any previous time.

### Plaintiffs' Proposed SCAC Fails to State a Claim

Legal Framework

Fed. R. Civ. P. 15(a)(2) requires this Court to grant leave to amend freely, when justice

so requires. A district court may, however, deny a request for leave to amend when such

amendment would be futile. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d

Cir. 2012). Amendment is futile when it would not survive a motion to dismiss. *Milanese v.*

*Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2000). Thus, the standard for granting a motion to

amend is whether such amendment would survive a motion to dismiss. *Id.*

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a plaintiff must

allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A complaint has facial plausibility when there is enough

factual content "that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept

all factual allegations in the complaint as true and draw all reasonable inferences in favor of the

plaintiff. *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

7

Securities fraud claims are also subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). In order to satisfy Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal citations omitted). While the PSLRA requires that a plaintiff plead the required mental state, scienter, with particularity, it otherwise imposes the same standard as Rule 9(b). *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000).

Rule 10b-5 provides, in relevant part, that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance on the misstatement; (5) loss causation; and (6) economic loss. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

## Falsity and Materiality

Materiality is a context-specific inquiry. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Whether a statement is material depends on whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). In order for a misstatement to be material, there must be a "substantial likelihood" that the disclosure of the omitted fact "would have been

viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

*ABN AMRO Statements*

The statements regarding the ABN AMRO acquisition in Plaintiffs' proposed SCAC include the exact same statements that this Court found to be inactionable "puffery" in *Lighthouse I.*[3] 902 F. Supp. 2d at 341. Statements that are "too general to cause a reasonable investor to rely on them," *ECA*, 553 F.3d at 206, or "expressions of puffery and corporate optimism," *Rombach*, 355 F.3d at 174, are not actionable. Defendants' statements that the ABN AMRO was off to a "promising start," and that they were "happy" with what they bought are too vague for any reasonable investor to rely on because they do not communicate any concrete information about the business, merely management's optimistic outlook. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (quoting *Rombach*, 355 F.3d at 174) (noting that "to a point, companies must be permitted to operate with a hopeful outlook."). These statements were not worded as guarantees, and Plaintiffs allege no facts to suggest that Defendants did not reasonably believe them. *See In re Int'l Bus. Mach. Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("*In re IBM*") ("projections of future performance may be actionable under Section 10(b) and Rule 10b-5 if they are worded as guarantees . . . or if the speaker does not genuinely or reasonably believe them."); *accord IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209, 2013 U.S. Dist. LEXIS 43774 at *29 (S.D.N.Y. March

---

[3] Compare SCAC ¶ 78 ("The integration of ABN AMRO is off to a promising start . . ."; "RBS has validated its plan . . ."; the acquisition has "rarely seemed more attractive and relevant. . .") with CAC ¶¶ 184, 192 (same); SCAC ¶ 84 ("the positive view we have of the ABN businesses has been confirmed."; ABN businesses are "in line with expectations."; the ABN acquisition goes "ching, ching, ching . . . We are happy we bought what we thought we bought.") with CAC ¶¶ 199, 196 (same).

9

27, 2013) ("statements that are loosely optimistic regarding a company's well-being have been found to be too vague and general to be actionable.").

Further, Plaintiffs take many of the statements pertaining to ABN AMRO out of context in order for them to appear to be misleading. *See In re Centerline Holdings Co. Secs. Litig., 678 F. Supp. 2d 150*, 160 n.63 (S.D.N.Y. 2009) (statements must be viewed in context to determine whether they are misleading). For example, Plaintiffs claim that the statement that "RBS has validated its plan" was misleading, because it was made in connection with ABN AMRO's securitized portfolio. SCAC ¶ 78. But that statement was not made in reference to ABN AMRO's assets, but rather the transition synergies and benefits of combining two companies into one. Plaintiffs do not allege that RBS never achieved these benefits, only that the acquisition was a disaster for RBS because of all the toxic assets that it inherited. Similarly, the statement about ABN AMRO being "more attractive and relevant" than ever was made in connection with ABN AMRO's "exposure to many high growth economies," not its balance sheet. Plaintiffs cannot dress up these statements through artful pleading to make them appear misleading. *C.f. In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 418 (S.D.N.Y. 2005) (cautioning against artful pleading in another securities law context).

*Exposure Statements*[4]

Plaintiffs' exposure claims fail to meet the definition of material under the "persuasive authority" of SEC Staff Accounting Bulletin ("SAB") No. 99 that courts in the Second Circuit employ to assess materiality. *ECA*, 553 F.3d at 197-98. Quantitatively, SAB No. 99 suggests

---

[4] The August 3, 2007 statements regarding RBS's exposures were made prior to the class period, and several months before any RBS security listed on any U.S. exchange. Because these statements were made prior to the start of the class period, they cannot form the basis for liability as a matter of law. *In re IBM*, 163 F.3d at 107 ("A defendant, however, is liable only for those statements made during the class period."). Therefore, the Court only addresses the December 6, 2007 and February 28, 2008 exposure statements.

that misstatements of less than 5% of assets, liabilities, revenues, or net income are "unlikely to be material," although quantifying the magnitude of the misstatement is "only the beginning" of the analysis. SAB No. 99, 64 Fed. Reg. 45150 (1999); *see also Ganino*, 228 F.3d at 164 (alleged misrepresentation relating to less than 2% of defendant's assets, in context, could be immaterial as a matter of law). SAB No. 99 also instructs courts to address qualitative factors, including whether the misstatement concealed an unlawful transaction, the significance of the misstatement in relation to the company's operations, and management's expectation that the misstatement will result in a significant market reaction. *Id.*; *see also ECA*, 553 F.3d at 197-98.

Even accepting Plaintiffs' allegation that RBS's true holdings were greater than they disclosed at the time, Plaintiffs only claim that RBS understated its exposure to U.S. subprime assets in its December 6, 2007 trading statement by £3.261 billion.[5] While this figure appears large at first blush, it amounts to merely 3.8% of the £86.275 billion of RBS's total asset backed securities exposure (*see* RBS Group, 2008 Annual Report and Accounts, Appendix 2 at 3), and 0.17% of RBS's £1,900.5 billion in total assets. RBS Group, 2007 Annual Report and Accounts at 36 ("Total assets were £1,900.5 billion at 31 December 2007."). Other courts have found alleged misstatements concerning such small amounts of assets to be immaterial. *See ECA*, 553 F.3d at 204 (recharacterizing 0.3% of assets from trades to loans immaterial to investors); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225, 2012 U.S. Dist. LEXIS 141449 (S.D.N.Y. Sept. 28,

---

[5] Additionally, it is not clear whether the two divergent numbers that Plaintiffs cite are intended to be apples to apples comparisons of RBS's subprime and CDO exposures. For example, the CDO exposure listed on the trading statement is explicitly limited to "U.S. sub-prime exposure," while the CDO figure in Appendix 2 to the 2008 Annual Report lists all CDOs, not just those exposed to the U.S. subprime market. Further, the super senior CDO holdings on the 2007 Annual Report cannot be false, as it is the exact same figure that Plaintiffs allege RBS listed on the 2008 Annual Report, £3.834 billion. SCAC ¶ 60, n.6, n.7.

2012) ($100 billion portfolio was less than 5% of defendant's $2 trillion in assets and not an undue concentration of risky assets).

Most of the qualitative factors also cut against materiality.  Plaintiffs do not claim that defendant's concealed any unlawful transaction, failed to comply with regulatory requirements, changed a loss to income, or masked a change in earnings.  They do contend that the concentration of subprime assets greatly affected RBS's financial health and was of keen interest to the market.  But what the market appeared interested in was RBS's structured portfolio as a whole, and Plaintiffs plead no facts that suggest that such a small difference in exposure would have been material.  As dealt with in greater length in this opinion's discussion of loss causation, Plaintiffs only plead that the market reacted to changes in the *valuation* of RBS's structured portfolio.  They do not claim that the market reacted adversely when RBS finally "revealed" its true exposures in February, 2008.  *See Kleinman v. Elan Corp.*, 706 F.3d 145, 155 (2d Cir. 2013) (market reaction is a measure of materiality); *accord Ganino*, 228 F.3d at 166.

Scienter

Scienter is a mental state "embracing intent to deceive, manipulate or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  To withstand a motion to dismiss, a plaintiff must plead "an inference of scienter at least as likely as any plausible opposing inference."  *Id.* at 328.  Courts must consider "competing inferences rationally drawn from the facts alleged."  *Id.* at 314.  A plaintiff may establish this strong inference of scienter by pleading particularized facts demonstrating either (1) that defendants had both the motive and opportunity

to defraud,[6] or (2) facts consistent with conscious misbehavior[7] or recklessness. *ATSI Commc'ns*, 493 F.3d at 99. Where a plaintiff fails to demonstrate a motive to defraud, "he must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001). The Court must analyze whether the facts alleged, both individually and taken collectively, give rise to the requisite strong inference of scienter. *Tellabs*, 551 U.S. at 322-32.

"Recklessness in the scienter context cannot be merely enhanced negligence." *ECA*, 363 F.3d at 624. It is conduct that is so highly unreasonable that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it. *Novak*, 216 F.3d at 308. An allegation that a defendant "ought to have known is not sufficient to allege recklessness. *In re UBS*, 2012 U.S. Dist. LEXIS 141449 at *43 (quoting *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001)) (internal quotation marks omitted). Rather, a plaintiff must specifically allege that defendants had knowledge of facts, or access to information, that contradicted their public statements. *Novak*, 216 F.3d at 308. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements

---

[6] Although Defendants had the opportunity to commit fraud (*see Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (noting that it is "indisputable that key directors and officers have [the] ability to manipulate their company's stock price.")), none of Plaintiffs' scienter allegations are consistent with the motive and opportunity prong of this test. The SCAC does not allege that any individual defendant sold large (or any) amounts of shares or otherwise profited from the alleged misstatements, which courts have traditionally associated with motive. *See, e.g., City of Austin Police Ret. Sys. .v. Kinross Gold Corp.*, No. 12 Civ. 1203, 2013 U.S. Dist. LEXIS 40523, at *40 (S.D.N.Y. Mar. 22, 2013); *Rombach*, 355 F.3d at 164 (scienter not sufficiently pled when "complaint identifies no personal interest sufficient to establish motive."). Therefore this Court only analyzes Plaintiff's scienter allegations under the test's second prong.

[7] Conscious misbehavior "encompasses deliberate illegal behavior," such as insider trading (*Novak*, 216 F.3d at 308) or market manipulation (*see Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 Civ. 8862, 2013 U.S. Dist. LEXIS 45883 at *18-23 (S.D.N.Y. March 28, 2013)). There are no facts alleged in the complaint that amount to such behavior, thus Plaintiffs' complaint, to survive, must adequately allege recklessness.

13

containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

*Exposure Statements*

Plaintiffs hinge many of their scienter allegations on facts from the FSA Report that indicate that senior RBS officials increasingly focused on their securitized portfolio as the crisis developed, and were continually kept appraised of the bank's exposures. *See, e.g.* SCAC ¶ 52. These allegations have two ultimately fatal flaws. First, nowhere do Plaintiffs allege that RBS's senior management was receiving numbers that *differed* from those they reported to the market. It is not enough to simply allege that defendants were receiving "reports;" rather, Plaintiffs must plead that the information that defendants' were receiving was different than that reported to the market. *Novak*, 216 F.3d at 308; *see also Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (general allegations about "internal reports" that do not specify their content are insufficient to plead scienter); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299-300 (S.D.N.Y. 2010) (dismissing a similar complaint for failure to plead scienter where the complaint did not identify any contrary information in the "reports" that defendants allegedly received).

Second, Plaintiffs do not allege that Defendants received any pertinent report at or around the time they made their misstatements. SCAC ¶ 52(e). Plaintiffs only allege that Defendants received reports on a few specific dates, and all of those dates were not later than September, 2007, several months prior to the first actionable misstatement. *See Id.* ¶52(b) (noting that the board received a report on the super senior CDO positions in August 2007; ¶ 52(c) (noting that senior management carried out an evaluation of market developments in August and September 2007); ¶ 36(f) (describing an email exchange relating to exposure in May, 2007). Thus, not only

14

do Plaintiffs not allege that Defendants were receiving information in these "reports" that differed from what they were communicating to the market, but they do not point to any specific information at all that senior management received within three months of the first alleged misstatement. This lack of temporal proximity is problematic given the rapidly changing market environment and the frequency at which banks often buy and sell assets.

Plaintiffs' allegation of scienter regarding RBS's subprime exposure is further undercut by the fact that RBS never restated its holdings. RBS's auditor gave RBS a clean opinion letter in both 2007 and 2008. Plaintiffs do not contend that RBS should have formally restated its holdings, or that RBS's auditor is liable for securities fraud on account of its clean opinion letter. The FSA report does not list accounting improprieties among the factors that led to RBS's demise.

The more plausible inference is that RBS, along with many other banks and market participants, simply did not anticipate the degree to which the assets on its balance sheet would deteriorate, become illiquid, and lose value. Given the magnitude of its share price decline over the class period (95%) and the capital infusion it required from the U.K. government in order to survive (£45.5 billion), RBS's management certainly made extremely poor business judgments. But "[b]ad judgment and poor management are not fraud, even when they lead to the demise of a once venerable financial institution." *In re Wachovia*, 753 F. Supp. 2d at 367. Plaintiffs have not come forward with particularized facts that could lead this Court to conclude that RBS ever sought to defraud investors by misleading them about its actual holdings. Whether RBS's

15

valuations kept pace with market events is another story, but Plaintiffs explicitly concede that they are not attempting to plead any claims with respect to valuation in their proposed SCAC.[8]

*Rights Issue Statement*

Plaintiffs' scienter allegation with respect to the misstatement in connection with RBS's rights issue adequately pleads recklessness because Plaintiffs demonstrated that RBS's senior management's public statements were contrary to the directives they received from the FSA. Plaintiffs allege that the CEO of the FSA specifically told RBS's senior management to raise capital, and shortly after that conversation, Defendants misled the market by explicitly stating that none of its regulators had asked it to raise money. SCAC ¶ 74. These are precisely the type of facts that Plaintiffs need to allege to adequately plead scienter. Plaintiffs, however, fail to plead that the market ever came to know the falsity of this statement during the class period. This failure to adequately plead loss causation, as discussed further below, prevents their complaint from surviving by virtue of this statement alone.

*Tellabs Analysis*

After considering the allegations individually, this Court must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-32  Although Plaintiffs have adequately plead scienter in connection with the alleged rights issue misstatement, after careful consideration, a reasonable person would not deem all of the facts, taken together, to raise a plausible inference of scienter with respect to any

---

[8] Further, "in 2007, what mortgage loans qualified as subprime was nebulous," which gives rise to the plausible inference that someone at RBS may have reclassified small amounts of exposures from one category to another over time, rather than some grand scheme by RBS's top brass to understate their exposures by a few billion pounds. *Stratte-McClure v. Morgan Stanley*, No. 09 Civ. 2017, 2013 U.S. Dist. LEXIS 10387 (S.D.N.Y. Jan. 18, 2013); *see also Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 178 (S.D.N.Y. 2012) (noting the ambiguity of the term "subprime" cut against the inference that the defendants' statements regarding exposure were recklessly made).

other statement, or the complaint as a whole. Plaintiffs have not pled facts that give rise to a strong inference that Defendants acted with the intent to deceive, manipulate, or defraud the market by misstating RBS's exposure by, at most, a very small amount. If Defendants were attempting to hide the magnitude of RBS's vulnerability to credit market write-downs, they did an extremely poor job of that, as evidenced by the billions of Pounds of write-downs they took, leading to a 95% decline in their share price which occurred prior to the "revelation" that they had slightly more subprime assets than previously disclosed.

The FSA Report, upon which Plaintiffs so heavily rely, buttresses this conclusion. The FSA conducted an extensive review of RBS's failure, focusing on the ABN AMRO acquisition, the investment banking division that was responsible for most of RBS's securitized assets, and certain public disclosures, involving over 50 interviews and 20,000 documents. FSA Report, Part III, ¶ 3. It specifically found that RBS's "bad decisions were not the result of a lack of integrity by any individual, and we did not identify any instances of fraud or dishonest activity by RBS senior individuals or a failure of governance on the part of the board." *Id.*, Part III, ¶ 25. Such a finding, although not completely dispositive, is inconsistent with bare allegations of an intent to deceive, manipulate, or defraud, where particularized factual allegations are necessary to plead a violation of Section 10(b).

Loss Causation

Plaintiffs' proposed SCAC fails for the independent reason that it does not adequately plead loss causation. Loss causation is the "causal connection between the material misrepresentation and the loss" the Plaintiffs suffered. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To properly plead it, a plaintiff must allege "that the misstatement or omission

17

concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). After all, "it is axiomatic that a concealed fact cannot cause a decrease in the value of a stock before the concealment is made public." *In re Sec. Capital Assur., Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 598 (S.D.N.Y. 2010) (quoting *In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 296 (S.D.N.Y. 2006) (internal quotations omitted)).

The Second circuit has outlined two possible methods of pleading loss causation, the "corrective disclosure" theory, and the "materialization of concealed risk" theory.[9] *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). In order to establish the former, a plaintiff needs to plead that "the market reacted negatively to a corrective disclosure, which revealed an alleged misstatement's falsity, or disclosed that allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007). To establish the latter, a plaintiff must make a factual allegation showing that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 513. Under either method, "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Lentell*, 396 F.3d at 174 (internal quotations omitted).

Plaintiffs' SCAC alleges that the artificial inflation in RBS's ADR price caused by Defendants' misstatements was removed through a series of partial disclosures throughout 2008

---

[9] Most courts in this Circuit require that pleading loss causation only needs to meet the pleading requirements of Fed. R. Civ. P. 8, not the heightened standard of Fed. R. Civ. P. 9(b). *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011) (collecting cases). Even elements that need only be pled to the standards of Fed. R. Civ. P. 8 must meet the plausibility requirement of *Iqbal*. 556 U.S. at 677-78.

and into early 2009 that revealed the previously concealed risks involving "RBS's subprime and other credit market exposures, financial results and capital ratios." SCAC ¶ 95. It alleges that the "full truth" behind RBS's fraud "was not revealed until (at the very earliest) January 19, 2009, when RBS announced an expected loss of £28 billion ($41.3 billion), the largest in U.K. financial history." *Id.*

Plaintiffs predominantly cite a series of news articles and company releases that discuss write-downs related to RBS's structured securities and the decline of securitized fixed income markets. *Id.* ¶¶ 98-106, 108-112, 120-123. For example, Plaintiffs cite a November 2, 2007 news article (an article that was written prior to any potentially actionable misstatement) that speculated that RBS was to incur a £2.1 billion write-down "due to the collapse of subprime and other credit market assets." *Id.* ¶ 98. Plaintiffs claim that additional news on November 19, 2007, February 28-29, 2008, April 19, 2008, April 22, 2008, and October 6-13, 2008 disclosed additional billions in write-downs related to various credit market holdings, and that these disclosures caused their loss. *Id.* ¶¶ 101-106, 108-112.

*Exposure Statements*

The information that these articles and company releases injected into the market did not, however, serve to disclose to the market what Plaintiffs allege to be the subject of their exposure misstatements. *See Lentell*, 396 F.3d at 173 (noting that to establish loss causation, a plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.") (emphasis in original). All of the revelations that Plaintiffs maintain caused their loss concern reduction in the *valuation* of RBS's assets—claims that Plaintiffs have specifically disavowed. None of these disclosures bear any indication that RBS had misled the investing public about the face value holdings of its securities. Thus, none of these alleged "partial

19

disclosures" connect the alleged exposure misstatements to the losses that Plaintiffs suffered in the market.

In fact, Plaintiffs only allege that the truth about RBS's exposure to subprime securities came out in RBS's 2008 annual report, which was released on February 26, 2009.  SCAC ¶¶ 8(f), 58 (noting that it was not until releasing its "revised 2007 numbers in Appendix 2 to its year-end 2008 financial results" that RBS "revealed it had understated its credit market holdings" by billions of pounds).  Plaintiffs do not allege that the market became aware that Defendants were allegedly (somewhere) hiding billions of pounds of exposure to structured securities at any previous point.  This revelation is insufficient to establish loss causation as a corrective disclosure because Plaintiffs do not link this revelation with any drop in the ADR price.  *See Masters v. GlaxoSmithKline,* 271 Fed. Appx. 46, 51 (2d Cir. 2008) (noting that a complaint fails to plead loss causation as a matter of law when it does not link a corrective disclosure with a drop in share price).

Further, this February 26, 2009 revelation occurred more than a month *after* the close of the proposed class period (January 20, 2009).  While Plaintiffs can rely on this revelation to demonstrate falsity (*Lapin*, 506 F. Supp. 2d at 237), it cannot be a corrective disclosure sufficient to establish loss causation.  *See Leykin v. AT&T Corp., 423 F. Supp. 2d 229,* 243-44 (S.D.N.Y. 2006) (finding that information cannot serve as a corrective disclosure if it was not disclosed during the class period); *accord Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Oao,* 811 F. Supp. 2d 853, 858 n.2 (S.D.N.Y. 2011) (noting that the complaint would fail to establish loss causation if the corrective disclosure occurred after the class period).

The proposed SCAC also does not establish that any of the partial disclosures establish loss causation under the materialization of concealed risk theory.  Certainly RBS's write-downs

in 2008 and 2009 demonstrated that the bank had made poor business judgments and was in ultimately dire shape, but nothing in the SCAC alleges that these write-downs were fueled by the market realizing that RBS had far more assets than it had revealed.  Rather, all of the partial disclosures were driven by RBS writing down the *value* of the securities that the market was aware that it owned.

*Rights Issue Statement*

The proposed SCAC fails to adequately allege loss causation with respect to the rights issue misstatement as well.  None of Plaintiffs' allegations indicate that the market became aware that Sants had asked senior RBS management to raise capital before Sants made this revelation to a U.K. Parliamentary investigatory committee on January 30, 2012.[10]  SCAC ¶ 74. This revelation occurred well after the class period ended and cannot serve as the basis for Plaintiffs' loss.  *See Kuriakose*, 897 F. Supp. 2d at 178 (alleged corrective disclosure released "years after the end of the Class Period" insufficient to establish loss causation).  A disclosure over three years after the end of the class period is far too "attenuated" to serve as the proximate cause of Plaintiffs' loss.  *Lentell*, 396 F.3d at 174 (noting that attenuated connections cannot serve as the basis for loss causation).  Further, Plaintiffs nowhere allege that the price of their ADRs declined after the public became aware of the FSA's directive.

Plaintiffs also fail to plead that the risk concealed by this misstatement materialized prior to the end of the class period.  The subject of the concealed risk was that RBS's regulator was concerned about its capital position.  Plaintiffs point to several news articles that indicate that

---

[10] A version of this statement appears in the FSA Report, which came out in December 2011, about a month prior to Sants's testimony.  FSA Report, Part II, ¶ 93 ([On April 9, 2008, t]he FSA CEO said that the FSA '*would need a written commitment from the Group that they would be pursuing a rights issue.* ') (emphasis and quotations in original).

*market participants* were concerned about RBS's capital position and thought RBS may have to raise additional capital, but none of these releases indicated that the *FSA* shared that concern. *See* SCAC ¶ 114 (noting that RBS's ADR price fell on market speculation that RBS would need another capital injection). While RBS did tap the U.K. government for "rescue capital" in October 2008, it did so pursuant to a government bailout plan that was available to all U.K. banks. *Id.* ¶¶ 116-17. This does not reveal that RBS's regulator thought that RBS was in a uniquely bad condition or that RBS had misled the market regarding the April, 2008 rights issue. It only indicates that RBS's financial health continued to deteriorate and that the bank was in need of still further capital as it continued to take large write downs based on the declining valuation of its securitized portfolio as the crisis wore on.

* * *

The FSA Report casts doubt on the notion that RBS's share price declined on account of any actionable securities fraud. The Report lists six major factors that led to RBS's decline, most of which concerned the fragility of the entire banking system and RBS's large exposure to low quality assets. FSA Report, Part I, ¶ 4. None of the factors implied that accounting irregularities or public misstatements or omissions played any role in the market losing confidence in RBS and its ultimate demise.

Section 10(b) is not meant "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms.*, 544 U.S. at 345. As the Second Circuit recognized in *Lentell*, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was

22

caused by the alleged misstatements as opposed to intervening events." 396 F.3d at 174-75

(quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994))

(internal quotations omitted). Plaintiffs' own SCAC indicates that the period between

December, 2007 and January, 2009 was fraught with intervening credit write-downs that dragged

the price of RBS's ADRs down by 95%. Most of the alleged "partial disclosures" that Plaintiffs

point to concern intervening events (i.e. write-downs) that Plaintiffs do not allege are the basis

for any securities fraud claim. The SCAC only alleges that the market became aware of the

Defendants' purportedly misleading statements after the class period ended (in the 2008 Annual

Report and Sants's testimony). Even if these events could suffice to plead loss causation (which

they cannot, because they occurred after the class period ended), the SCAC fails to connect these

revelations to any decline in the price of RBS's ADRs.[11]

---

[11] Plaintiff's CAC was also dismissed for failure to plead compliance with the statute of limitations. *Lighthouse I*, 902 F. Supp. 2d at 346-348. Plaintiffs' proposed SCAC remedies this by specifically detailing for the Court facts that indicate that Plaintiffs brought this action within the applicable two-year statute of limitations. 28 U.S.C. § 1658. The original complaint alleging violations of the Exchange Act on behalf of ADR holders was brought on July 15, 2009 in *Zemprelli v. The Royal Bank of Scotland Group, PLC*, No. 09 Civ. 300. Although the ADR holders were dismissed from this action after it was revealed that none of the named plaintiffs in *Zemprelli* had actually purchased any ADRs, the *Zemprelli* complaint tolled the applicable statute of limitations under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 668-670 (S.D.N.Y. 2011) (partially abrogated on other grounds by *Police & Fire Ret. Sys. v. Indymac MBS, Inc.*, 2013 U.S. App. LEXIS 13203 (2d Cir. June 27, 2013)). After the ADR holders were dismissed, they promptly brought this new action within the time period allowed.

The Court notes that the statute of limitations period only begins to run after "a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 176 L. Ed. 2d 582, 599 (2010). The SCAC reveals that Plaintiffs did not have enough facts to adequately plead falsity or scienter before the FSA Report came out in December 2011, well after the proposed class period ended. This makes their allegation that an adequate investigation would have revealed sufficient facts as early as July 2009 suspect. Nonetheless, because the statute of limitations is an affirmative defense, dismissing claims on statute of limitations grounds at the complaint stage is only appropriate if the "complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

23

## Conclusion

Plaintiffs' motions for leave to amend (ECF Nos. 156 and 159) are DENIED. As this marks Plaintiffs' fourth attempt to adequately allege a cause of action (*see* ECF Nos. 1 (complaint), 4 (amended complaint), and 71 (CAC)), this denial is with prejudice.

Dated: New York, New York
      August 2, 2013

SO ORDERED:

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge
